DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Co-Counsel to David Di Pietro*
One N. Lexington Avenue
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Steven R. Schoenfeld, Esq.

BERGER SINGERMAN LLP
*Co-Counsel to David Di Pietro*
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
(305) 755-9500
Christopher Jarvinen, Esq.
Mitchell W. Berger, Esq. (admitted *pro hac vice*)
Jordi Guso, Esq. (admitted *pro hac vice*)
Sharon Kegerreis,Esq.  (admitted *pro hac vice*)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.* | ) | Lead Case No. 17-22770 |
| | ) | (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA EX REL. DAVID DI PIETRO, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding No. |
| | ) | 17-08284 |
| v. | ) | |
| | ) | |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., | ) | |
| 21st CENTURY ONCOLOGY, INC., and 21ST CENTURY | ) | |
| ONCOLOGY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**RESPONSE IN OPPOSITION TO DEBTORS' MOTION TO DISMISS FIRST**
**AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**
**PURSUANT TO 11 U.S.C. § 1141(d)(6)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARDS ......................................................................................................... 5

ARGUMENT ......................................................................................................................... 6

I.    Plaintiff has Adequately Alleged a Non-Dischargeable Debt under 11 U.S.C.
§1141(d)(6)(A). ........................................................................................................ 6

A.    The Debt is Owed to a Domestic Governmental Unit .................................... 7

B.    The Debt is Also Owed to An Individual. ...................................................... 7

C.    The Debt is of a Kind Specified in Section 523(a)(2)(A) .............................. 8

II.   The FCA's Public Disclosure Bar Does Not Apply. ............................................... 15

A.    Public Disclosure is Limited to Sources Enumerated By Statute. ................. 15

B.    Public Disclosure Requires that Essential Elements of Fraud be Disclosed. ............ 16

C.    The Original Source Exception. .................................................................... 16

D.    No Public Disclosure as Defined by Statute Occurred. ................................. 17

E.    DiPietro Qualifies as an Original Source. ..................................................... 19

III.  Plaintiff Has Alleged Fraud With Particularity. ..................................................... 20

A.    The False Claims Have Been Alleged with Particularity. ............................. 21

B.    The Misrepresentations Have Been Alleged With Particularity. ................... 23

C.    The Underlying Fraudulent Scheme Has Been Pled With Particularity. ....... 24

CONCLUSION ................................................................................................................... 27

# TABLE OF AUTHORITIES

Page

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................ 5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir.2007) ...................................................................................... 5

*Chill v. Calamos Advisors, LLC,*
  175 F. Supp. 3d 126 (S.D.N.Y. 2016) ................................................................... 24

*Cohen v. de la Cruz,*
  523 U.S. 213 (1998) ................................................................................................ 9

*Cooper v. Blue Cross and Blue Shield of Fla.,*
  19 F.3d 562 (11th Cir. 1994) ............................................................................ 16, 18

*Erickson v. Pardus,*
  551 U.S. 89 (2007) .................................................................................................. 5

*Fitzgerald v. Henderson,*
  251 F.3d 345 (2d Cir. 2001) ................................................................................... 14

*Gentry v. Kovler (In re Kovler),*
  249 B.R. 238 (Bankr. S.D.N.Y. 2000) .................................................................... 9

*Graham County Soil & Water Conservation Dist. et al. v. U.S. ex rel. Wilson,*
  559 U.S. 280  (2010) ............................................................................................. 19

*Hirsch v. Hilltop Grocery at Grand, Inc.,*
  No. 11 Civ. 7202(TPG), 2013 WL 1165509 (S.D.N.Y. Mar. 19, 2013).................. 5

*Husky Intern. Electronics, Inc. v Ritz,*
  ___ U.S. ___, 136 S. Ct. 1581(2016) ...................................................................... 9

*In re Hawker Beechcraft, Inc.,*
  515 B.R. 416 (S.D.N.Y. 2014) ................................................................................ 8

*In re Spicer,*
  155 B.R. 795 (Bankr. D.C. 1993)........................................................................... 10

*Kennard v. Comstock Rs., Inc.,*
  363 F. 3d 1039 (10th Cir. 2004).............................................................................. 17

*Martin v. State Univ. of New York,*
  704 F. Supp. 2d 202 (E.D.N.Y. 2010).................................................................... 14

*Minnie Rose LLC v. Yu*,
   169 F. Supp. 3d 504 (S.D.N.Y. 2016) ............................................................ 6

*National R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002) ....................................................................................... 14

*Ping-Chen ex rel. U.S. v. EMSL Analytical, Inc.*,
   966 F. Supp. 2d 282 ( S.D.N.Y. 2013) ..................................................... 18, 19

*Schindler Elevator Corp. v. United States ex. rel Kirk*,
   131 S.Ct. 1885 (2011) ............................................................................. 15, 16

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir.1994) ............................................................................ 24

*U.S. by Dept. of Defense v. Caci Intern, Inc.*,
   885 F. Supp. 80 (S.D.N.Y. 1995) .................................................................... 8

*U.S. ex rel. Estate of Cunningham v. Millennium Laboratories of California, Inc.*,
   713 F.3d 662 (1st Cir. 2013) ........................................................................... 16

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
   23 F. Supp. 3d 242 (S.D.N.Y. 2014) ........................................................ 21, 22

*United States ex rel. Colquitt v. Abbott Laboratories*,
   858 F. 3d 365 (5th Cir. 2017) .......................................................................... 2

*United States ex rel. Eisenstein v. City of New York*,
   540 F. 3d 94 (2d Cir. 2008) ............................................................................. 7

*United States ex rel. Hutcheson v. Blackstone Medical, Inc.*,
   647 F.3d 377 (1st Cir. 2011) ........................................................................... 12

*United States ex rel. McNutt v. Haleyville Medical Supplies*,
   423 F.3d 1256 (11th Cir. 2005) ...................................................................... 12

*United States ex rel. Milam v. University of Texas*,
   961 F. 2d 46 (4th Cir. 1992) ......................................................................... 7, 8

*United States ex rel. Osheroff v. Humana, Inc.*,
   776 F. 3d 805 (11th Cir. 1985) ....................................................................... 19

*United States ex rel. Rabushka v. Crane Co.*,
   40 F. 3d 1509 ........................................................................................... 16, 18

*United States ex rel. Springfield Terminal Ry. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) .......................................................................... 16

*United States ex rel. Wilkins v. United Health Group, Inc.*,
   659 F.3d 295 (3d Cir. 2011) ................................................................ 12

*United States v. Rivera*,
   55 F. 3d 703 (1st Cir. 1999) ................................................................ 21

*United States v. Rogan*,
   459 F.Supp.2d 692 (N.D.Ill.2006) ........................................................ 12

*United States v. TEVA Pharmaceuticals USA, Inc.*,
   2016 WL 750720 (S.D.N.Y. 2016) ............................................. 11, 21, 23

*United States v. Wells Fargo Bank*, N.A.,
   972 F. Supp. 2d 593 (S.D.N.Y. 2013) ................................................... 6

*Universal Health Services v. United States*,
   ___ U.S. ___, 136 S. Ct. 1989 (2016) ............................................... 9, 21

*Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*,
   529 U.S. 765 (2000) ...................................................................... 7, 8

*Wang v. FMC Corp.*,
   975 F. 2d 1412 (9th Cir. 1992) ........................................................... 17

## **Statutes**

11 U.S.C. §1141(d)(6)(A) ......................................................... i, 1, 6, 7, 8

11 U.S.C. §3730(b)(1) ......................................................................... 7

11 U.S.C. § 101(27) ........................................................................... 7

11 U.S.C. § 1141(d)(6) ............................................................... 1, 8, 27

31 U.S.C. 3130(c)(3) ......................................................................... 8

31 U.S.C. §3729(a)(1) ........................................................................ 7

31 U.S.C. §3730(e)(4)(A) ........................................................ 15, 16, 18, 19

31 U.S.C. §3730(e)(4)(B) ...................................................................... 3

31 U.S.C. § 3731(b) ......................................................................... 14

42 U.S.C. 1320a-7b(b)(1) & (2) ............................................................. 11

42 U.S.C. §1320a-7b(b) .................................................................. 2, 11

42 U.S.C. §1320a-7b(b)(2)(A) .............................................................. 11

iv

42 U.S.C. §1395nn (e)(2)................................................................................................ 12

42 U.S.C. §1395nn(a) .................................................................................................... 12

42 U.S.C. § 1320a-7b(b)(1)(A) ...................................................................................... 11

42 U.S.C. § 1320a-7b(g) .......................................................................................... 10, 11

42 U.S.C. § 1395nn (a)(2)(B), (h)(1) ............................................................................ 13

42 U.S.C.§1395nn(a)(1).................................................................................................. 12

[FCA]." Section 3730(c)(3) ............................................................................................. 7

Section 523(a)(2)(A) of the Bankruptcy Code................................................................. 1

§3730(c)(2)(A) ................................................................................................................. 8

§3730(c)(2)(B) ................................................................................................................. 8

§ 1320a-7b(f) .................................................................................................................. 11

## Rules

Fed. R. Civ. P. 8(a)(2)...................................................................................................... 5

Fed. R. Civ. P. 9(b) ................................................................................................. passim

## Regulations

42 C.F. R. 1001.952(d) ................................................................................................... 12

42 C.F.R. 411.357(p)(iii) ............................................................................................... 15

42 C.F.R. §411.351 ........................................................................................................ 13

42 C.F.R. § 411.354(c)................................................................................................... 13

42 C.F.R.§411.354(a)..................................................................................................... 13

OIG Anti-Kickback Provisions,
    56 Fed. Reg. 35952 (1991)....................................................................................... 11

Safe Harbor Provisions under the Anti-Kickback Statute,
    64 Fed. Reg. 63518 (1999)....................................................................................... 11

Plaintiff, David Di Pietro ("Di Pietro" or "Plaintiff") submits this response in opposition to the *Debtors' Motion to Dismiss First Amended Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 1141(d)(6)* ("MTD" or the "Motion") filed by the Defendant-Debtors (collectively, the "Debtors", "Defendants" or "21st Century Oncology"). Because Plaintiff has properly pled the elements of a non-dischargeable debt arising from the proposed First Amended Complaint to be filed by Plaintiff David Di Pietro in the Southern District of Florida entitled *United States ex rel David Di Pietro v. 21st Century Oncology, Inc.* et al. (Case No. 16-60853-CV-KMW) (the "Complaint" or "FAC"), Debtors' Motion must be denied.

## **INTRODUCTION**

The Amended Complaint to Determine Dischargeability of Debt in this Adversary Proceeding incorporates the allegations contained in the proposed Complaint to be filed in the Southern District of Florida. Debtors' liability for violations of the False Claims Act (the "FCA") as alleged in the Complaint is a non-dischargeable debt pursuant to Section 1141(d)(6) of the Bankruptcy Code, which excepts from discharge a debt owed to (i) a domestic governmental unit obtained by false representations, false pretenses or actual fraud, or (ii) an individual as a result of an action brought under the FCA. *See* 11 U.S.C. §1141(d)(6)(A).

Both prongs of Section 1141(d)(6) apply here. First, the Complaint establishes liability for a non-dischargeable debt because (1) it represents a claim for recovery by the government of funds wrongfully obtained from it; and (2) the conduct alleged involves "false pretenses, false representation or actual fraud" as contemplated by Section 523(a)(2)(A) of the Bankruptcy Code. Second, because the underlying Complaint is a *qui tam* action in which an individual relator has brought the action on behalf of the United States, the debt is also non-dischargeable because it represents a debt owed to an individual as a result of an FCA action. Because Debtors submitted

1

false claims for payment to the federal government which arose from a contract which Debtors

obtained by fraud, any liability resulting from this *qui tam* action is a non-dischargeable debt

under the Bankruptcy Code.

In the Complaint, Di Pietro has brought an action on behalf of the United States alleging

that Debtors defrauded the federal government by submitting false claims for payment to Federal

Healthcare Programs. The legal falsity of the claims is based upon misrepresentations made by

the Debtors, namely, false certifications that the service provider [Debtors] complied with the

Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), (the "AKS") and other applicable laws.

Through these false certifications, Debtors misled the Government as to the underlying

fraudulent conduct that enabled them to obtain a lucrative contract with the North Broward

Hospital District d/b/a Broward Health ("Broward Health"). Specifically, the Complaint alleges

that Debtors knowingly engaged in violations of the AKS and the *Stark* law to obtain a contract

to provide radiation oncology services for Broward Health that resulted in referrals of thousands

of Medicare patients to the Debtors.  Knowing that compliance with the AKS and *Stark* laws is a

condition for payment by the Government, Debtors caused Medicare claims to be submitted that

were ineligible for the payments demanded.  Debtors' misrepresentations concerning compliance

with these laws -- which constitutes an express condition for payment by the Government -- give

rise to liability under the False Claims Act.  *See United States ex rel. Colquitt v. Abbott*

*Laboratories*, 858 F. 3d 365 (5th Cir. 2017)(holding that Medicare claims induced by kickbacks

constitute false claims under the FCA if the provider falsely certifies compliance with the AKS).

There is no merit to Defendants' contention that the public disclosure bar contained in the

FCA requires dismissal of the Complaint.   There were no public allegations that Debtors

obtained the contract with Broward Health by fraud.[1]  None of the kickback allegations or *Stark* violations contained in the Complaint was disclosed by the news media or in any other source material enumerated in the statute.  While press reports contained details of the transaction -- including its unusual and highly favorable terms for 21st Century Oncology and to the detriment of Broward Heath, Debtors' ties to Florida Governor Rick Scott and the large campaign contributions made by Debtors to Scott's campaign – there was nothing in the press or in any other enumerated source that revealed the critical elements of the fraud, that is, that Debtors procured the contract through illegal inducements including the promise of job security and employment benefits for Broward CEO Frank Nask ("Nask") and the promise of unlawful referrals of patients for other medical services offered by Broward Health.  At most, media reports implied that 21st Century Oncology benefited from its political ties to Governor Scott, but the press did not reveal any facts that would establish Debtors' underlying fraudulent conduct

Even if the media reports contained public disclosures of the fraud at issue (which they did not), Relator Di Pietro qualifies as an original source which independently defeats application of the public disclosure defense.  Under the statutory definition, an original source is one "who has knowledge that is independent of and materially adds to the publicly disclosed allegations and transactions." 31 U.S.C. §3730(e)(4)(B).  Relator Di Pietro added material information independent of the media articles and other sources cited by Debtors, including his direct conversations with Debtors' lobbyist who exposed the fraudulent methods used by Debtors to threaten and bribe Nask into supporting the contract, Nask's misrepresentations to the

---

[1]  Under the contract North Broward Hospital District d/b/a Broward Health outsourced its radiation oncology services to 21st Century Oncology LLC, which is a wholly-owned subsidiary of Debtor 21st Century Oncology, Inc.  *See* FAC ¶22.  Debtor 21st Century Oncology, Inc. is a domestic subsidiary owned by Debtor 21st Century Oncology Holdings, Inc. *See* FAC ¶24.  Throughout this pleading, Plaintiff refers to 21st Century Oncology LLC as "Debtors" or "21st Century Oncology."

Broward Health Board of Commissioners concerning the economic value of the contract,  Nask's unauthorized pay-offs to the prior provider of radiation oncology services and Nask's conversation  revealing that Debtors had promised referrals to Broward Health in exchange for the contract. Accordingly, Di Pietro qualifies as an original source, precluding dismissal of this adversary proceeding and the underlying Complaint upon which it is based.

Nor is there any merit to Defendants' contention that Plaintiff has failed to plead with sufficient particularity that the debt owed to the government was procured by false pretenses, false representations or actual fraud. Plaintiff has provided specific details of the exact nature of the false statements that Debtors caused to be submitted to federal healthcare administrators. Plaintiff has further alleged specific facts that demonstrate how and why the claims based upon these false statements were fraudulent.  According to the Complaint, Debtors obtained a contract with Broward Health to provide radiation oncology services through a fraudulent kickback scheme which included bribery of Broward Health's former CEO, the offer of illegal referrals for ancillary medical services and an explicit threat to remove the former CEO unless the contract was awarded.  *See* FAC ¶¶ 51-70.  Debtors participated in this scheme to defraud in concert with Nask, the former CEO of Broward Health, who obtained Board approval for the contract by making fraudulent misrepresentations to the Board of Commissioners for Broward Health concerning the economics of the contract, including falsely stating that the prior service provider had caused significant financial losses to Broward Health. *See* FAC ¶¶ 95-107.  Nask further concealed the true circumstances surrounding the contract award by making a series of "hush money" payments to the prior provider of radiation oncology services. *See* FAC ¶¶ 108-127. Debtors' fraudulently-obtained contract caused thousands of false claims for radiation therapy services to be submitted and paid by federal healthcare programs. *See* FAC ¶210. Plaintiff has

4

identified the specific misrepresentations contained in the certifications required by federal healthcare programs and the circumstances surrounding the submissions of these claims sufficient to meet the requirements of Fed. R. Civ. P. 9(b).

For the reasons stated herein, Defendants' Motion to Dismiss the First Amended Complaint to Determine Dischargeability of Debt should be denied.

## <u>LEGAL STANDARDS</u>

Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint"); *Hirsch v. Hilltop Grocery at Grand, Inc.*, No. 11 Civ. 7202(TPG), 2013 WL 1165509, *1 (S.D.N.Y. Mar. 19, 2013) ("It is well established that, at the motion to dismiss stage, a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor.") (*citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Fed. R. Civ. P. 9(b) requires that Plaintiff plead the specific acts of fraud with particularity. *See In re Vanarthos*, 440 B.R.67, 72 (Bankr. S.D.N.Y. 2010). Under Rule 9(b), "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), the complaint must state with particularity the specific statements or conduct giving rise to the fraud claims. Such pleading requirements, however, may be relaxed when information is exclusively in the possession of defendants so long as plaintiff has adequately set forth a factual basis for the allegations. *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 517-18 (S.D.N.Y. 2016).

"Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013)

## ARGUMENT

### I. Plaintiff has Adequately Alleged a Non-Dischargeable Debt under 11 U.S.C. §1141(d)(6)(A).

Under Section 1141(d)(6)(A) of the Bankruptcy Code, confirmation of a plan does not discharge a corporate debtor from any debt "of a kind specified in paragraph 2(A) or 2(B) of Section 523(a) that is owed to a domestic governmental unit, or owed to a person as a result of an action filed under subchapter III of chapter 37 of title 31 or any similar state statute."

A.      **The Debt is Owed to a Domestic Governmental Unit**

Applying the first clause of Section 1141(d)(6)(A), the debt resulting from a *qui tam* action is owed to a governmental unit.[2]  The purpose of the Federal Claims Act ("FCA") is to redress the injury-in-fact suffered to the United States both for the injury to its sovereignty caused by a violation of its laws as well as "the proprietary injury resulting from the alleged fraud." *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). In an FCA action, the relator brings the action "for the person and for the United States." 11 U.S.C. §3730(b)(1).  Although the relator has standing to pursue the FCA claim, the defendant nevertheless "is liable to the United States Government," 31 U.S.C. §3729(a)(1), and "the claim itself belongs to the United States."  *United States ex rel. Eisenstein v. City of New York*, 540 F. 3d 94, 98 (2d Cir. 2008).   Even if the Government declines to intervene, the Government still must be served with copies of all pleadings and deposition transcripts and may intervene at any time later in the litigation.  *See United States ex rel. Milam v. University of Texas*, 961 F. 2d 46, 50 (4th Cir. 1992)(the "United States is the real party in interest in any False Claims Act suit, even where it permits a qui tam relator to pursue the action in its behalf.").    On January 16, 2018, the United States filed a *Statement of Interest of United States of America* in this adversary proceeding providing its position on certain legal claims made by Debtors and confirming its continuing interest in the case.

B.      **The Debt is Also Owed to An Individual.**

Plaintiff's claims are also non-dischargeable under the second clause of Section 1141(d)(6)(A) as "debts owed to a person as a result of an action filed under the [FCA]." Section 3730(c)(3) of the FCA explicitly states that "[if] the Government elects not to proceed with the

---

[2] The term "governmental unit" is defined in the Bankruptcy Code to include the United States. 11 U.S.C. § 101(27).

action, the person who initiated the action shall have the right to conduct the action." 31 U.S.C. 3130(c)(3). The Government may intervene later, but only "upon a showing of good cause" and "without limiting the status and rights of the person initiating the action." *Id*. The relator has the right to a hearing before the Government can voluntarily dismiss a suit, §3730(c)(2)(A); and the relator is entitled to a court determination of reasonableness before the Government may settle a suit over the relator's objection, §3730(c)(2)(B).

A relator who prosecutes an FCA action therefore has an interest in the lawsuit itself beyond simply a right to receive a share of the recovery. *Vermont Agency of Natural Resources*, 529 U.S. at 772; *see also U.S. by Dept. of Defense v. Caci Intern, Inc*., 885 F. Supp. 80 (S.D.N.Y. 1995)(holding that the Government may not extend the time that *qui tam* complaint should remain under seal without good cause). Writing for the District Court for the Southern District of New York, Judge Kevin Castel explicitly rejected the interpretation of this section made by the Bankruptcy Court that a relator's claims were owed solely to the Government and thus were not "debts owed to a person" within the meaning of Section 1141(d)(6)(A). *In re Hawker Beechcraft, Inc.*, 515 B.R. 416, 433-34 (S.D.N.Y. 2014). While Judge Castel did not need to decide the issue of whether debts derived from an FCA action are, in fact, owed to the relator as well as to the United States, the plain language of the FCA statute and the Supreme Court's decision in *Vermont Agency of Natural Resources* support this conclusion.

As relator's claims here represent a debt to an individual under the FCA, such debt is non-dischargeable under the plain language of Section 1141(d)(6).

## C.    The Debt is of a Kind Specified in Section 523(a)(2)(A).

For a debt owed to the Government to be non-dischargeable, it must also arise from fraudulent conduct, false pretenses or false representations as set forth in Section 523(a)(2)(A). "[T]he most straightforward reading of §523(a)(2)(A) is that it prevents discharge of 'any debt' .

. . that the debtor has fraudulently obtained, including treble damages assessed on account of the fraud." *See Cohen v. de la Cruz*, 523 U.S. 213, 214 (1998). Section 523(a)(2)(A) exempts from discharge debts based on "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The statute incorporates the elements of common law fraud, including fraudulent misrepresentations and scams, schemes, artifices or other forms of deceit. *See Husky Intern. Electronics, Inc. v Ritz,* ___ U.S. ___, 136 S. Ct. 1581(2016)(finding that "actual fraud" under Section 523(a)(2)(A) does not require a misrepresentation, but encompasses many types of deceptive conduct so long as done with wrongful intent). The term "false pretenses" means "conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicanery in the accomplishment of an unlawful objective." *Gentry v. Kovler* (*In re Kovler*), 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000) (stating that "false pretenses" is "the practice of any scam, scheme, subterfuge, artifice, deceit or chicanery in the accomplishment of an unlawful objective).

Plaintiff's FCA allegations are based on Debtors' fraudulent misrepresentations to the Government. Debtors submitted or caused to be submitted false certifications to the federal agencies responsible for administering the Medicare Program and other federal healthcare programs -- which included statements that the services provided were not procured through the payment of any kickback and acknowledgements that the provider complied with all laws, regulations and program instructions (including the Federal Anti-Kickback Statute ("AKS") and *Stark* laws) -- knowing that such statements were untrue. Predicated on a false certification theory, Plaintiff alleges that Debtors engaged in fraud by making material misrepresentations as to their compliance with the AKS and *Stark* laws. *See Universal Health Services v. United*

*States*,  ___ U.S. ___, 136 S. Ct. 1989 (2016) (False certification theory as a basis for FCA liability is based upon the principles of common law fraud which cover fraudulent misrepresentations and omissions).

As alleged in the Complaint, the certifications submitted to the Government in connection with Debtors' claims for payment for radiation oncology services were false because Debtors violated two federal laws, the AKS and the *Stark* law, in order to procure the contract upon which the claims were based.  Any claim seeking payment for services obtained through kickbacks constitutes a false claim under the FCA. *See* 42 U.S.C. § 1320a-7b(g). Grounded in obtaining Government funds through false certifications, Plaintiff's claims meet the requirements for non-dischargeability under Section 523(a)(2)(A).  *See In re Spicer*, 155 B.R. 795 (Bankr. D.C. 1993)(holding that the elements of actual fraud necessary for non-dischargeability under Section 523(a)(2)(A) were met where claims arose from debtor's submission of false statements to government to obtain government mortgage insurance). Therefore, the fraudulent conduct alleged in the Complaint makes any resulting debt non-dischargeable under Section 523(a)(2)(A).

(1)    *The Alleged Violations of the Anti-Kickback Statute and Stark laws.*

The AKS arose out of Congressional concern that kickbacks or bribes to those who can influence health care decisions corrupt medical decision-making and can result in goods and services being provided that are medically unnecessary, too costly, of poor quality or even harmful to a vulnerable patient population. The AKS prohibits any person or entity from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the

furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

The AKS has two separate liability provisions, the violation of *either* subjects a person to liability. *See* 42 U.S.C. § 1320a-7b(b)(1)(A) (prohibiting the solicitation and receipt of remuneration in exchange for referrals; 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration to induce referrals). The AKS specifies that "remuneration" includes "any kickback, bribe or rebate" and broadly applies to benefits provided "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. 1320a-7b(b)(1) & (2).[3]

"In 2010 Congress amended the AKS to clarify that compliance with the AKS is a precondition to payment." *United States v. TEVA Pharmaceuticals USA, Inc.,* 2016 WL 750720 at 20 (S.D.N.Y. 2016). "[T]he AKS now states that, 'a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act].'" *Id. (citing* 42 U.S.C. § 1320a-7b(g)). "The AKS applies to all 'Federal health care program[s],' including Medicare and Medicaid." *Id.* (citing § 1320a-7b(f)).   "The 2010 Amendment therefore made clear that compliance with the AKS is a precondition to the payment of claims submitted to these programs, and not merely a condition of participation in the programs." *Id.*

---

[3]    The OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), confirm "remuneration" is "anything of value in any form whatsoever." The Department of Health and Human Services Office of the Inspector General (HHS-OIG) has repeatedly confirmed "remuneration" means "anything of value." *See, e.g.*, Safe Harbor Provisions under the Anti-Kickback Statute, 64 Fed. Reg. 63518 (1999), and HHS OIG Fact Sheet: Federal Anti-Kickback Law and Regulatory Safe Harbors (Nov. 18, 1999). "In some industries, it is acceptable to reward those who refer business to you. However, in the federal health care programs, paying for referrals is a crime." *See A Roadmap for New Physicians, Avoiding Medicare and Medicaid Fraud and Abuse,* p. 4, published by the U.S. Department of Health & Human Services, Office of Inspector General (OIG) (OIG is the entity principally charged with issuing interpretive guidance concerning the Anti-Kickback Statute).

Even prior to the statutory amendment, compliance with the AKS was a material condition of payment under federal healthcare programs. *United States ex rel. Hutcheson v. Blackstone Medical, Inc*., 647 F.3d 377, 392 (1st Cir. 2011); *United States ex rel. Wilkins v. United Health Group, Inc*., 659 F.3d 295, 313 (3d Cir. 2011); *United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005); *United States v. Rogan*, 459 F.Supp.2d 692, 717 (N.D.Ill.2006) ("Falsely certifying compliance with the Anti-Kickback Statute in a Medicare cost report is actionable under the FCA"), *aff'd* 517 F.3d 449 (7th Cir. 2008). Claims for medical services tainted by kickbacks or bribes are ineligible for payment by federal healthcare programs.[4]

The *Stark* law prohibits physicians from referring Medicare and Medicaid patients to business entities in which they or their immediate family members have a financial interest. 42 U.S.C. §1395nn(a). The *Stark* law applies if the physician has a financial relationship with the entity that receives the referral.[5] 42 U.S.C.§1395nn(a)(1). The *Stark* Law broadly defines

---

[4] Debtors argue that its contract with Broward Health satisfies the "personal services contract safe harbor" under the Anti-Kickback Statute. *See* Motion at ¶51. Debtors acknowledge that this safe harbor requires that the compensation must be "consistent with fair market value in arms-length transactions" and "not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties." *Id*. (*quoting* 42 C.F.R. 1001.952(d)). With no analysis or support, Debtors conclude that the contract satisfies the safe harbor.

Debtors ignore 62 paragraphs of the Complaint alleging in detail why the financial terms of the deal with Broward Health were not "consistent with fair market value in arm's length transactions." (*See* FAC ¶¶ 15, 16, 17, 48, 49, 50, 99, 100, 101, 102, 142-180, 191-204).

[5] Defendants allege that Plaintiff fails to properly allege a *Stark* law violation because "referring physicians do not include radiation oncologists," Motion at ¶47, and because the financial arrangements at issue satisfy the safe harbor provisions of the statute for *bona fide* employment relationships, 42 U.S.C. §1395nn (e)(2), Motion at ¶¶48-49.

Defendants fail to state a basis to dismiss the Amended Complaint. As the United States has now pointed out in its Statement of Interest, radiation oncologists are not exempt from the Stark law. *See* Statement of Interest by the United States at 5 (stating the exclusion is "narrowly

prohibited "financial relationships" to include "compensation arrangements" in which any "remuneration" is paid by an entity to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn (a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c)..

Here, Plaintiff has alleged a fraudulent scheme in which Debtors hired a lobbyist close to Governor Scott who had the ability to control the appointments to the Broward Health Board of Commissioners.[6] Through the power of Debtors' agent-lobbyist, Debtors offered  former Broward Health CEO Nask financial inducements including continued employment, salary, pension, benefits and severance in exchange for the award of a contract that provided for the referral of thousands of patients insured by federal healthcare programs. *See* FAC ¶¶51-59. Plaintiff specifically alleges that Debtors offered Nask the additional incentive of patient referrals to Broward Health for ancillary medical services, which services would be covered by federal healthcare programs.  *See* FAC ¶94.  As a co-conspirator in the fraud, Nask sought to disguise the unlawful kickback scheme by paying off the prior provider of radiation oncology services to depart quietly, *see* FAC ¶¶108-127, and misrepresenting to the Board of

---

defined: "[R]eferrals of any radiation oncologist are subject to the *Stark* law unless they fall squarely within the scope of the exclusion in 42 C.F.R. §411.351.")  The Complaint alleges that Debtors promised Nask referrals for "ancillary medical services" such as surgeries, chemotherapy, outpatient visits and hospital admissions unrelated to the provision of radiation oncology services. *See* FAC at ¶60.  These services do not come within the exception to the *Stark* law cited by Defendants.

Similarly, the promised referrals alleged in the Complaint do not fall within the safe harbor for physician compensation arrangements under 42 C.F.R.§411.354(a) as Defendants assert.  Plaintiffs has presented detailed factual allegations that 21st Century obtained a lucrative contract for itself and its physicians based in part upon promised referrals made to Broward Health.

[6] The Statement of Interest filed by the United States refutes Defendants' contention that the conduct of 21st Century Oncology's lobbyist is subject only to statutes governing political lobbying and cannot violate the AKS. *See* Motion at ¶52.  As the United States points out, "if the lobbying activity meets all the AKS's criteria, it violates the AKS, regardless of whether it may also be regulated under other law." *See* Statement of Interest by the United States at 3.

Commissioners the true economic value of the contract, *see* FAC ¶¶96-107. Debtors' fraudulent

intent can also be inferred from its lengthy history of trying to procure a contract with Broward

Health through unlawful means, including offering unlawful referrals to Broward Health's prior

CEO Alan Levine, *see* FAC ¶¶41-43, and offering a bribe to the former Treasurer of the Broward

Health Board of Commissioners Robert Bernstein, *see* FAC ¶¶44-45.[7] These allegations describe

an intentional scheme to defraud that fully meets the requirements for a non-dischargeable debt

under Section 523(a)(2)(A).

Plaintiff has alleged that as part of its effort to obtain a contract with Broward Health,

Debtors offered Nask the added benefit of referrals from its physicians for other Broward Health

services. This alleged promise of referrals of Medicare patients to Broward Health, an entity in

which Debtors had a financial relationship, constitutes a *Stark* law violation. Debtors attempt to

dodge the *Stark* laws allegations by suggesting that it has no "referring physician owners or

investors" and that any violation could only be based upon "indirect compensation

arrangements." Motion at ¶49. As implausible as that sounds for a company that markets itself

as the world's "largest global, physician led provider of integrated cancer care," Debtors cannot

insulate themselves from *Stark* law liability by claiming that their physicians receive no indirect

financial benefit from a contract that provides Debtors with an estimated $100 million yearly

---

[7] Defendants make the specious argument that based on the FCA's six-year limitations period, 31 U.S.C. § 3731(b), that all allegations supporting the scheme to obtain the contract with Broward Health concerning events prior to April 19, 2010 are time-barred. See Motion at ¶35. The makes no sense: a statute of limitations is not a bar to alleging relevant facts even if such events occurred outside the limitations period for claims. Because these events relate to a continuing scheme to defraud and illustrate Defendants' fraudulent intent, such allegations are relevant and admissible. *See Martin v. State Univ. of New York,* 704 F. Supp. 2d 202, 223, n.18 (E.D.N.Y. 2010) (A statute of limitations is not a rule of evidence, it does not bar introduction of evidence that predates the statute of limitations period) (citing *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 102 (2002) and *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period *but that is relevant to events during the period*.").

windfall, see FAC ¶¶ 191-204.  Moreover, Debtors ignore *Stark* law's requirement that any

"indirect compensation arrangement" **must not violate the Anti-Kickback Statute**. *See* 42

C.F.R. 411.357(p)(iii). In this case, there are extensive detailed allegations that the entire

arrangement for 21st Century's physicians to provide radiation oncology services at Broward

Health was procured by violations of the Anti-Kickback Statute.

## II.     The FCA's Public Disclosure Bar Does Not Apply.

Defendants erroneously contend that the Complaint must be dismissed under the public

disclosure bar contained at 31 U.S.C. §3730(e)(4)(A) based upon (1) two news articles published

by the *Florida Bulldog*, (2) Debtors' SEC filings that disclosed the terms of its contract with

Broward Heath and (3) the minutes of the January 30, 2012 meeting of the Broward Health

Board of Commissioners at which the award of the contract to 21st Century was discussed and

approved.  *See* Motion at ¶¶ 25-34. Defendants' arguments reflect a fundamental misreading of

the FCA.

### A.     Public Disclosure is Limited to Sources Enumerated By Statute.

Under the FCA as amended in 2010 by the Patient Protection and Affordable Care Act

(the "PPACA"), the public disclosure bar provides:

> The court shall dismiss an action or claim under this section, unless opposed by
> the Government, if substantially the same allegations or transactions as alleged in
> the action or claim were publicly disclosed – (i) in a Federal criminal, civil or
> administrative hearing in which the Government or its agent is a party; (ii) in a
> congressional, Government Accountability Office, or other Federal report,
> hearing, audit, or investigation; or (iii) from the news media, unless the action is
> brought by the Attorney General or the person bringing the action is an original
> source of the information.

31 U.S.C. 3730(e)(4)(A).   As a threshold issue, public disclosure must occur through one of the

specific sources enumerated in the statute.  "By its plain terms, the public disclosure bar applies

to some methods of public disclosure and not to others." *Schindler Elevator Corp. v. United*

*States ex. rel Kirk*, 131 S.Ct. 1885, 1895 (2011).  Second, the public disclosure must involve

"substantially the same allegations or transactions as alleged in the action or claim." *Id*.

### B.    Public Disclosure Requires that Essential Elements of Fraud be Disclosed.

Public disclosure of a fraud occurs only when the essential elements exposing a particular

transaction as fraudulent are disclosed.  *See U.S. ex rel. Estate of Cunningham v. Millennium*

*Laboratories of California, Inc.,* 713 F.3d 662, 670 (1st Cir. 2013)("To be a disclosure of fraud, a

disclosure must either contain a direct allegation of fraud or allow for a proper inference of fraud

by revealing a misrepresented state of facts in conjunction with a true state of facts").  The public

disclosure from one of the three specific enumerated sources must contain sufficient indicia of

wrongdoing so as to raise a reasonable inference of fraud.  *See United States ex rel. Rabushka v.*

*Crane Co.*, 40 F. 3d 1509 (finding that public disclosures of pension fund shortfalls did not

reveal intentional wrongdoing by Crane as alleged in *qui tam* complaint); s*ee also Cooper v.*

*Blue Cross and Blue Shield of Fla*., 19 F.3d 562, 567 (11th Cir. 1994)(GAO report criticizing

payment monitoring plan and noting conflict of interest found "***not*** to constitute a 'public

disclosure of allegations or transactions that BCBSF knowingly violated the law.") Mere

disclosure of the subject matter of the transaction alleged to be fraudulent is insufficient to

preclude a *qui tam* lawsuit.  *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645,

655 (D.C. Cir. 1994)(noting that the presence of only one state of facts in the public domain

"cannot be expected to set government investigators on the trail of fraud").

### C.    The Original Source Exception.

If there has been no public disclosure through one of the specifically enumerated

channels specified in the statute, then the original source exception is not relevant. "Where there

has been no 'public disclosure' within the meaning of section 3730(e)(4)(A), there is no need for

a *qui tam* plaintiff to show that he is the 'original source' of the information." *United States ex*

*rel. Wang v. FMC Corp.*, 975 F. 2d 1412, 1416 (9th Cir. 1992); s*ee also Kennard v. Comstock Rs., Inc.,* 363 F. 3d 1039, 1042 (10th Cir. 2004) (reaching original source inquiry only after completing the other steps of the inquiry to find the allegations are based on public disclosures). Conversely, even if there has been a prior public disclosure of the "allegations or transactions as alleged" through one of the three statutory sources, the relator may still proceed with the action if he or she qualifies as an "original source."

**D.    No Public Disclosure as Defined by Statute Occurred.**

Here, none of the sources cited by Defendants disclosed the key allegation in the Complaint -- that Debtors obtained a contract with Broward Health through fraudulent conduct. First, the *Florida Bulldog* articles contained nothing about illegal kickbacks or referrals. The first article published in the *Florida Bulldog* on February 22, 2016 focused on Governor Scott's $210,000.00 investment in a private equity firm that invested in Debtors.[8]    It highlighted the unusual terms of the Broward Health contract, including describing the length of the no-bid contract as an "initial term of 10 years and three separate five-year renewal options," but makes no allegation that Debtors obtained the contract unlawfully by paying kickbacks to Nask and promising illegal referrals to Broward Health.  The second *Florida Bulldog* article published two days later on February 24, 2016, questioned the terms of the contract in light of Nask's statements to the Broward Health Board that this practice area was losing money.  It further discussed campaign contributions made by Debtors to Governor's Scott's re-election campaign, inauguration, political action committees and the Florida Republican Party. While these articles raised questions about the economics of the contract and suggested a potential conflict of interest

---

[8] Defendants focus upon Plaintiff's quote in this article that he was "stunned" to learn of Governor Scott's indirect ownership interest in Debtors. *See* Motion at ¶13.  Plaintiff's claims, however, are not based upon the Governor's investment or potential conflict of interest but instead upon specific acts of fraud perpetrated by Debtors' agents.   The *Bulldog* articles contained no allegations of fraud.

for Governor Scott, the articles do not indicate at all that Debtors engaged in specific acts of fraud to procure the contract.

Unlike the facts of *Ping-Chen*, cited by Defendants, the public disclosures in the *Florida Bulldog* were not "substantially the same" as the allegations in the Complaint. *Cf. Ping-Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282 ( S.D.N.Y. 2013) (public disclosures included prior federal prosecutions of  related companies for a scheme to defraud based upon false lab reports which were the same as the allegations in the complaint). The *Florida Bulldog* articles do not accuse Debtors of any wrongdoing and do not give rise to any inference of fraud. *See also Rabushka*, 40 F. 3d at 1509 (disclosure of pension fund problems not a public disclosure of fraud); *Cooper*, 19 F.3d 562, 567 (disclosure of potential conflict of interest found not to constitute public disclosure of fraud allegation).

Nor does the information submitted by Debtors in their public filings with the Securities and Exchange Commission ("SEC') satisfy the requirements for the public disclosure defense. First, the Debtors' own filings with the SEC are not a "congressional, Government Accountability Office, or other Federal report, hearing, audit or investigation . . . " and, therefore, such filings with the SEC are not a statutorily  enumerated source. *See* 31 U.S.C. 3730(e)(4)(A).  Moreover, even if it were an enumerated source, the Form 8-K attached to Defendants' Motion simply states the following about the Broward Health contract:

> Separately, the Company also entered into a License Agreement with the North Broward Hospital District to license the space and equipment and assume responsibility for the operation of the radiation therapy departments at Broward General Medical Center and North Broward Medical Center, where Radiation Therapy had previously provided professional services. The license agreement is for an initial term of ten years, with three separate five year renewal options. Radiation Therapy expects the license agreement to contribute approximately $7.2 million and $2.2 million in revenues and EBITDA, respectively, during the first year of operations.

*See* Exhibit D to Defendants' Motion. The disclosure of the contract itself reveals nothing about whether it had been fraudulently obtained. Unlike the cases cited by Defendants, there was nothing on the face of the contract or about its terms that raised an inference of fraud. *Cf. United States ex rel. Osheroff v. Humana, Inc.*, 776 F. 3d 805 (11th Cir. 1985)(public disclosure of free services provided to clinic patients at taxpayer expense does raise inference of fraud). Here, nothing about the mere existence of the contract itself implicates the Debtors in fraudulent conduct or would alert the Government to the possibility of wrongdoing. *Cf. Ping Chen*, 966 F. Supp. at 298 (where prior federal prosecutions of companies for a scheme to defraud who participated in same environmental abatement projects as qui tam defendant were likely to alert federal authorities to prospect of wrongdoing by defendants).

Finally, the minutes of the Broward Health Board of Commissioners meetings do not qualify as an enumerated source under the statute and cannot be used as a basis for the public disclosure defense.[9] *See* 31 U.S.C. 3730(e)(4)(A). Even if they were a statutorily enumerated source those minutes contain no reference to the illegal kickbacks made by the Debtors to Defendant Nask or to his efforts to conceal the circumstances surrounding the contract, including the pay-offs made to the prior provider of radiation oncology services.

### E.    DiPietro Qualifies as an Original Source.

Even if there had been prior public disclosures (which there were not), Plaintiff qualifies as an original source, barring application of the public disclosure defense. A relator may use

---

[9] Under the PPACA enacted in 2010, Congress narrowed the language of the public disclosure bar to eliminate all state or local materials as enumerated sources. *Cf. Graham County Soil & Water Conservation Dist. et al. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010)(decided under prior version of the public disclosure bar in which local administrative hearings qualified as an enumerated source). The Supreme Court in *Graham County* recognized that under the language of the new law, which took effect March 23, 2010, local source material would no longer qualify as a basis for the public disclosure defense. *Id.* at fn. 1.

prior public disclosures in filing an action if he or she qualifies as an "original source." The

PPACA enacted in March of 2010 changed the definition of "original source" in the FCA:

> For purposes of this paragraph, "original source" means an individual who either (1) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) **who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.**

Even if there had been a public disclosure of the allegations of fraud through one of the specific

sources enumerated in the statute (which there was not), Plaintiff had "knowledge that [was]

independent of and materially adds to the publicly disclosed allegations or transactions." Here,

Plaintiff did not simply "materially add" to the publicly disclosed allegations. *Di Pietro is the*

*only source who revealed to the government that Debtors procured the contract through*

*kickbacks to Nask.* Similarly, because of Plaintiff's position as former Chair of the Board of

Commissioners, Nask shared with Plaintiff that one of the inducements for him to enter into the

contract was the promise of referrals from Debtors' physicians to Broward Health for ancillary

medical services, an arrangement that violated the *Stark* laws. Similarly, Plaintiff alone was the

only one to reveal that Nask had made large suspicious payments to the prior provider of

radiation oncology services to clear the way for the 21st Century Oncology contract.

### III.   Plaintiff Has Alleged Fraud With Particularity.

Defendants erroneously claim that Plaintiff has failed to adequately plead that the debt

was obtained by false pretenses, false representations or actual fraud so as to make it non-

dischargeable under Section 523(1)(2)(A). Motion at ¶36. Defendants assert that the Complaint

has not adequately alleged fraud against the Debtors. *See* Motion at ¶2. More specifically,

Defendants complain that neither the kickback allegations nor the alleged promise of unlawful

referrals involve misstatements or false pretenses. *See* Motion at ¶5,6.

20

Defendants misunderstand the nature of a FCA complaint. The core of Plaintiff's FCA case is the false claims submitted by the Debtors to the Government. "[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.' *United States v. Rivera*, 55 F. 3d 703, 709 (1st Cir. 1999). As the essential element of a *qui tam* action under the False Claims Act, the specific false claims submitted to the government for payment must be plead with sufficient particularity to meet the requirements of Fed. R. Civ. P. 9(b). *United States v. TEVA Pharmaceuticals USA, Inc.,* 2016 WL 750720 (S.D.N.Y. 2016). The underlying fraudulent conduct that results in the submission of fraudulent claims is included in the 'circumstances constituting fraud or mistake' that must also be plead with particularity under Rule 9(b). *Id.* at 12.

The false certifications submitted in connection with the claims for payment to federal healthcare programs fully meet the requirement of a false representation under Section 523(1)(2)(A). *See Universal Health Services v. United States*, ___ U.S. ___, 136 S. Ct. 1989 (2016) (False certifications in an FCA case **are** fraudulent misrepresentations under common law fraud principles). Here, Plaintiff has pled with sufficient specificity the details of the false claims themselves as well as the nature of the fraudulent schemes upon which they were based.

### A.    The False Claims Have Been Alleged with Particularity.

First, Plaintiff has adequately pled the submission of false claims to the Government in connection with the Debtors' contract. A claim arising from the submission of false claims in violation of the FCA must be pled with "a high enough degree of particularity that defendants' can 'reasonably identify particular false claims that were submitted to the government.'" *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 257-58 (S.D.N.Y. 2014)("Novartis I"). This specificity must "provide the defendant with enough details to be able to reasonable discern which of the claims it submitted are at issue." *Id.* at 258. In *Novartis*, the United States did not

21

identify any particular claim that was allegedly false. 23 F. Supp. 3d at 250. Rather, the government alleged that every claim in "defined pools" was false. The complaint defined those "pools" as claims (1) for two specific drugs, (2) submitted by identified defendants to certain government programs, (3) during a specified time period. *Id*. at 265. The pleading was held sufficient under Rule 9(b).

Here, the Complaint similarly satisfies the Rule 9(b) standard. Plaintiff has alleged that all claims in a defined pool were false. The pool is comprised of all claims by 21st Century Oncology (1) arising under the Radiation Oncology Services Agreement with Broward Health (2) that were submitted for reimbursement to federal health care programs, (3) from September 2011 through the present. Because the AKS prohibits bribes in the procurement of a contract for the treatment of patients covered by federal healthcare programs, all claims submitted under this contract constitute false claims.

Importantly, identifying the false claims at issue in this case does not require examples of patient admissions or individual claim submissions as is needed in some FCA actions alleging unnecessary or unauthorized medical services, upcoding of services to obtain higher reimbursement, unbundling of services, or duplicative billings. Rather, the false claims at issue are based on bribery in the procurement of a contract for the treatment of patients covered by the Medicare Program. From reviewing the Complaint, the Defendants know exactly what claims are at issue in this case---all claims they submitted to federal health care programs for services under the Radiation Oncology Services Agreement.

Here, Plaintiff has provided sufficient information for Defendants to identify the false claims at issue that were submitted by the Debtors to the federal Medicare, Medicaid and TRICARE programs.  Plaintiff has identified ***all*** of the claims for payment of radiation therapy

services that were made under the Debtors' contract with Broward Health as false claims under

the FCA.  *See* FAC at ¶¶261-263.  As Plaintiff has clearly identified the pool of claims that it

alleges were false, Defendants can reasonably identify from their own records, the false claims

for payment that were submitted to the Government. *See also TEVA Pharmaceuticals US,* 2016

WL 750720 at 14 (finding it sufficient under Rule 9(b) for plaintiff to allege that all claims from

a specifically defined pool were false).

### B.      The Misrepresentations Have Been Alleged With Particularity.

Plaintiff has further alleged with particularity the specific misrepresentations that led to

the submission of these false claims.  *See* FAC ¶¶256-279.  For example, the enrollment

application that Debtors executed in order to participate in the Medicare Program contains the

following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to this provider. The Medicare laws, regulations, and program instructions
> are available through the Medicare contractor. **I understand that payment of a
> claim by Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations and program instructions
> (including but not limited to, the Federal anti-kickback statute and the Stark
> law),** and on the provider's compliance with all applicable conditions of
> participation in Medicare."

(Emphasis added) (FAC ¶ 258).

Debtors and Broward Health have each executed at least one provider agreement with

CMS in which they agreed to abide by the Medicare laws, regulations and program

instructions…" CMS Provider/Supplier Enrollment Application Forms 855-A and 855-B. 21st

Century Oncology expressly certified its understanding "that payment of a claim by Medicare is

conditioned upon the claim and the underlying transaction complying with such laws, regulation

and program instructions (including, but not limited to, the Federal anti-kickback statute and the

Stark law)…" *Id.*  With respect to electronic claims submitted by Debtors to the Medicare

Program, Debtors expressly certified in each claim that "it will submit claims that are accurate, complete, and truthful" and "acknowledge[d] that all claims will be paid from Federal funds…and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim is required pursuant to Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Debtors' illegal scheme also caused Broward Health to submit thousands of claims for payment to the Medicare Program based on false representations to the federal government. (*See* FAC ¶¶263-279).    Under Rule 9(b), Plaintiff has pled sufficient details to describe the misrepresentations, to identify the circumstances in which they were made and to explain why they were fraudulent.

### C.    The Underlying Fraudulent Scheme Has Been Pled With Particularity.

Plaintiff has also pled with particularity the nature of the underlying fraud scheme and how it was linked to the false claims submitted to the Government.[10] The Complaint identifies statements or promises made in furtherance of the fraudulent and illegal scheme, who made them, where and when the statements were made and why they were fraudulent.    These allegations include statements made by Debtors through its agents in an effort to obtain without competition, valuable property and property rights from Broward Health. They also include statements by Nask, a knowing participant and co-conspirator in the fraud.  The facts as alleged, all of which are due to be accepted as true with all inferences in favor of Plaintiff, "give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d

---

[10]Defendants' contention that Plaintiff "provide*s* **no** evidence" to support certain allegations they identify is baseless. *See* Motion at ¶39. No "evidence" is required at the motion to dismiss stage, only factual allegations—due to be accepted as true with all inferences drawn in the non-movant's favor—that meet the plausibility standard enunciated by the Supreme Court. *See Chill v. Calamos Advisors, LLC,* 175 F. Supp. 3d 126, 138 (S.D.N.Y. 2016) (noting that, "at the motion-to-dismiss stage, … Plaintiffs are not required to produce evidence….")

Cir.1994) (finding that facts giving rise to a strong inference of fraudulent intent may be shown by facts reflecting "motive and opportunity to commit fraud" *or* which "constitute strong circumstantial evidence of conscious misbehavior or recklessness.").

Contrary to Defendants' Motion to Dismiss, Plaintiff has adequately pled the "'who what, when where and how'" of the fraudulent scheme. *See* Motion at ¶39.The Complaint provides extensive factual details about "who, what, when, where and how" Debtors procured this contract in violation of the AKS and *Stark* laws. For example, it describes a specific lunch meeting that occurred on August 29, 2011, in which -- prior to recommending Plaintiff to a seat on the Broward Health Board of Commissioners – Debtors' agent/lobbyist Bill Rubin told Plaintiff that he [Rubin] was "controlling the appointments" for the Broward Heath Board and that he "needed" Plaintiff's support for Debtors' contract with Broward Health. *See* FAC ¶¶ 79-87. At this meeting, Rubin told Plaintiff that Dr. Daniel Doseretz, the principal of the Debtors, was a "close friend" of Governor Scott and a major contributor to his campaign. *See* FAC ¶84. The Complaint alleges Nask's knowing participation in the fraud by detailing a series of three suspicious payments – flagged by Broward Health's internal auditor -- all made on September 8, 2011, to the prior radiation oncology provider only eleven (11) days before signing the deal with Debtors. *See* FAC ¶¶108-127. The Complaint identifies a meeting between Plaintiff and Nask that occurred just prior to the meeting of the Board of Commissioners on January 30, 2012, in which Nask told Plaintiff that Debtors had promised referrals of patients for ancillary medical services to Broward Health in exchange for the contract. *See* FAC ¶94. This conversation was corroborated by Nask's own admission before the Board of Commissioners for Broward Health on June 20, 2012, that Broward Health "had done very little" about addressing *Stark* law violations and cautioned the Board of Commissioners about discussing the issue in public. *See*

FAC ¶69. On January 30, 2012, Nask misrepresented the economics of the Debtors' contract, falsely telling the Board that the prior provider was losing money and that the contract would benefit Broward Health. *See* FAC ¶96-99.  Plaintiff met several times with Dr. Doseretz and Nask directly, including a specific meeting in 2013 at Ruth's Chris Steakhouse in Naples, Florida in which Doseretz again touted his "close relationship" with the Governor and promised to arrange for Nask to meet with the Governor "so he would know that Frank is a good guy."  *See* FAC ¶185-188. In March, 2012, Debtors' lobbyist/agent Rubin again had a meeting with Plaintiff in which Rubin told Plaintiff not to question "my appointments" and urged him "to move forward as a team" to support Nask and the Debtors' contract. *See* FAC ¶¶185-190  When Plaintiff tried to investigate the "hush payments" made by Nask to the prior provider, Debtors' agent Rubin again met with Plaintiff on September 6, 2012, at Yolo's Restaurant in Ft. Lauderdale and told Relator to be a "team player" and to support Nask and the Governor. *See* FAC ¶ 139.  When Nask retired in March 2015, Rubin, on behalf of Debtors, lobbied the Board of Commissioners, to give Nask a generous severance package even though Broward Health had been subject to a fine of $70 million for other FCA violations under Nask's watch and even though Nask's employment contract did not provide for any severance payments upon retirement.  *See* FAC ¶ 70-72.  These, and other specific factual allegations made in the Complaint, create a strong inference of fraud and describe with particularity the unlawful kickback scheme perpetrated by Debtors and Broward Health to violate the AKS and the *Stark* law. Accordingly, the allegations in the Complaint meet the requirements of Fed. R. Civ. P. 9(b).

## **CONCLUSION**

For the reasons outlined above, Debtor's Motion to Dismiss the First Amended Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §1141 (d)(6) must be DENIED.

Dated: White Plains, New York
      January 19, 2018

DELBELLO DONNELLAN
WEINGARTEN WISE & WIEDERKEHR, LLP
*Co-Counsel to David DiPietro*
One N. Lexington Avenue
White Plains, New York 10601
(914) 681-0200

By:*/s/ Jonathan S. Pasternak*
Jonathan S. Pasternak, Esq.

BERGER SINGERMAN LLP
*Co-Counsel to David DiPietro*
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
(305) 755-9500

By: */s/ Mitchell W. Berger*
Mitchell W. Berger (admitted pro hac vice)
Christopher Jarvinen, Esq.
Jordi Guso, Esq. (admitted pro hac vice)
Sharon Kegerreis, Esq. (admitted *pro hac vice*)