UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
In re:

21st CENTURY HOLDINGS, INC., *et al.*    Chapter 11
                                         Case No. 17-22770 (RDD)
         Debtors.


- - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA EX REL.
DAVID DI PIETRO,

         Plaintiff,                      Adv. P. No. 17-
                                         08284(RDD)


         v.

21st CENTURY ONCOLOGY HOLDINGS, INC.,
21st CENTURY ONCOLOGY, INC., and
21st CENTURY ONCOLOGY, LLC,

         Defendants.
- - - - - - - - - - - - - - - - - - x
A P P E A R A N C E S :

KIRKLAND & ELLIS LLP

     Attorneys for the Reorganized Debtors/Defendants
     BY:  JACOB H. JOHNSTON and MARK MCKANE

DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP

     Attorneys for Ex rel. Plaintiff, David Di Pietro
     BY:  STEVEN R. SCHOENFELD

BERGER SINGERMAN LLP

     Attorneys for Ex rel. Plaintiff, David Di Pietro
     BY:  JORDI GUSO and SHARON KEGERREIS

**MODIFIED BENCH RULING ON MOTION TO DISMISS**

Hon. Robert D. Drain
United States Bankruptcy Judge


         On May 25, 2018 the Court issued a bench ruling on the

1

portion of the reorganized debtors/defendants' (the

"Debtors") motion for an order dismissing this adversary

proceeding pursuant to Fed. R. Bankr. P. 7009 and 7012 that

the Court had not previously granted in its prior bench

ruling on January 30, 2018.  As I alerted the parties at the

hearing, I am filing this modified bench ruling to correct

and improve on the syntax and structure of the May 25, 2018

oral ruling, the result of which has already been

memorialized by an order dated June 4, 2018 granting the

motion to dismiss in full.  This Modified Bench Ruling is

more colloquial and immediate than a memorandum of decision

(and delivered faster), but I hope it is more readable than

the bench ruling transcript which it supersedes.


     This is the adjourned hearing from January 30, 2018 on

the Debtors' motion to dismiss the first amended complaint

herein[1] pursuant to Fed. R. Bankr. P. 7009 and 7012,

---

[1] Although the complaint at issue is styled a "First Amended Complaint to
Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 1141(d)(6),"
this is the first motion to dismiss that the Court has considered in
this adversary proceeding.

It is also worth noting that this adversary proceeding actually involves
two complaints:  the first being the complaint in this adversary
proceeding, which seeks a declaration of non-dischargeability under 11
U.S.C. § 1141(d)(6) of the claims under the False Claims Act, 31 U.S.C.
§ 3729-33, which were asserted against the Debtors in the second
complaint, in the District Court for the Southern District of Florida, a
copy of which is attached as an exhibit to and is incorporated in the
first complaint. Because the motion to dismiss focuses primarily on
infirmities in that second complaint, references herein to the
"complaint" are unless otherwise noted to the second, False Claims Act

2

incorporating Fed. R. Civ. P. 9(b) and 12(b)(6).

At the January 30, 2018 hearing, I granted certain aspects of the Debtors' motion to dismiss: I denied the claims of the relator plaintiff, Mr. De Pietro (the "Plaintiff") in this *qui tam* action based on the Debtors' alleged violations of the Stark Law, 42 U.S.C. § 1395nn, which were premised on alleged offers of patient referrals, including as a basis for the Debtors' alleged violations of the False Claims Act, 31 U.S.C. § 3729, *et. seq.*; and I ruled against the Plaintiff regarding his proffered interpretation of the application of section 1141(d)(6) of the Bankruptcy Code, 11 U.S.C. § 1146(d)(6), to his own right to recovery under the False Claims Act (as opposed to the claims that he is pursuing on the United States' behalf).

As to the latter ruling, I concluded that the plain language of Bankruptcy Code section 1141(d)(6) and Southern District of New York precedent limit the Plaintiff's right to a declaration of non-dischargeability to his claim for his fees in a successful *qui tam* action[2] and not to his right under 31 U.S.C. § 3730(d) to a percentage of a recovery on

---

complaint.

[2] At the January 30, 2018 hearing the Debtors conceded that the Plaintiff's individual claims to compensation for his attorneys fees under the False Claim Act, if established, would be non-dischargeable under section 1146(d)(6).

3

the claims that he is pursuing on behalf of the United States for alleged violations of the False Claims Act or in any other way through the Government's possible recovery.

The latter, far larger potential claim I concluded is clearly not a claim that would be owed to the Plaintiff individually but, rather, would be owed to the United States and, therefore, is outside the coverage of section 1141(d)(6)'s plain terms. *See* 11 U.S.C. § 1141(d)(6): "The confirmation of a plan does not discharge a debtor that is a corporation from any debt – (A) of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is *owed to a domestic governmental unit*, or *owed to a person* as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State Statute. (Emphasis added.) *See also United States ex rel. Minge v. Hawker Beechcraft, Inc.*, 493 B.R. 696, 710-12 (Bankr. S.D.N.Y. 2013) (concluding that the two italicized clauses above are separate and therefore that a *qui tam* plaintiff is entitled only to have the aspects of his or her claim that are not first owed to a governmental unit under the False Claims Act be declared non-dischargeable). In *United States ex rel. Minge v. Hawker Beechcraft, Inc.*, 515 B.R. 416 (S.D.N.Y. 2014), the District Court reversed that decision on other grounds but in doing so agreed with the Bankruptcy Court

4

that clauses 1 and 2 of section 1141(d)(6)(A) are independent and give rise to separate non-dischargeable claims as limited thereby. *Id.* at 424-25.

I will not repeat the reasons stated in the transcript of the January 30, 2018 hearing for concluding that the complaint does not allege necessary elements of a claim for violation of the Stark Law and thus that the complaint's False Claim Act claims based on allegations of the offer of improper patient referrals should be dismissed.

Plaintiff's remaining claims are based on the Debtors' alleged violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, as a basis for the complaint's False Claims Act claims. As with the complaint's False Claims Act allegations based on the Stark Law, claims would arise under the False Claims Act if the Debtors violated the Anti-Kickback Statute and then, as the complaint alleges, failed to disclose such violations in their certifications to the United States in connection with enrolling in and billing for Government-reimbursed health programs. 31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G).

The motion to dismiss contends that the complaint's False Claims Act claims based on violations of the Anti-Kickback Statute fail because the Plaintiff does not satisfy 31 U.S.C. § 3730(e)(4)(A) and (B) in that, as alleged by the

Debtors, the crux of those Anti-Kickback Statute claims was publicly disclosed by other sources before the Plaintiff shared them with the Government and the Plaintiff lacks knowledge that is independent of and materially and timely added to such publicly disclosed allegations.[3]

At the January 30, 2018 hearing, I reserved ruling on what I'll refer to as this "prior public disclosure issue," based in large part on the need for briefing on a second, related issue deriving from the fact that the complaint's allegations that the Debtors violated the False Claims Act based on their violations of the Anti-Kickback Statute in turn depend almost entirely on alleged conduct by the

---

[3] 31 U.S.C. § 3730(e)(4) performs a gatekeeping function for False Claims Act claims. *Chen v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 295-97 (S.D.N.Y. 2013). It states in relevant part:

"(A) The Court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed -- . . .

"(iii) In the news media, unless the person bringing the action is an original source of the information.

"(B) For purposes of this paragraph, 'original source' means an individual who either (1) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which the allegations or transactions in a claim are based, or (2) has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and who has voluntarily provided the information to the Government before filing an action under this section."

Here, it does not appear that clause 1 of subsection (B) applies. For purposes of subsection (B)(2), the motion to dismiss does not contest that the Plaintiff provided the complaint to the Government before filing it; it does contest, however, that the Plaintiff has knowledge that is independent of and materially adds to the prior public disclosure.

Debtors' lobbyist, Bill Rubin ("Rubin").

I noted at the January 30, 2018 hearing that False Claims Act claims sound in fraud,[4] and, therefore, that Fed. R. Bankr. P. 7009, which incorporates Fed. R. Civ. P. 9(b) applies to them.[5] Given the complaint's lack of particularity in describing the scope and conduct of Rubin's agency on the Debtors' behalf (indeed, as discussed later, most of the complaint's references to Rubin's agency are wholly conclusory), I asked the parties to brief whether and to what extent Fed. R. Civ. P. 9(b) applied to those portions of the complaint focusing on the relationship between Rubin and the Debtors and the complaint's allegations with respect to Rubin's conduct.

The prior public disclosure issue and this Rule 9(b) issue are related because, as discussed in more detail later, the only aspect of the complaint that arguably materially adds to the prior public disclosure of the facts underlying the complaint's remaining False Claims Act claims relate to Rubin's lobbying role on the Debtors' behalf; if that role is insufficiently pled or the complaint's

---

[4] "The FCA is the United States Government's primary tool for redressing fraud against the Government." *Chen v. EMSL Analytical*, 966 F. Supp. 2d at 295 (internal quotation and citation omitted).

[5] Fed. R. Civ. P. 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge or other conditions of a person's mind may be alleged generally."

7

description of Rubin's conduct, to the extent sufficiently
pled, does not substantially add to the prior public
disclosures, the remaining False Claim Act claims should be
dismissed, too.

Having reviewed the parties' post-hearing briefs and
considered all of the pleadings filed in connection with the
motion to dismiss, as well as the transcript of the January
30, 2018 hearing and, of course, the complaint, I have
determined to grant the remaining aspect of the motion to
dismiss for the following reasons.

As noted, in this *qui tam* action the Plaintiff/relator
asserts False Claims Act claims on behalf of the United
States based on alleged false certifications by the Debtors
in their transactions with the Government, primarily in
connection with the Debtors' enrolling in and billing for
the Government's Medicare, Medicaid and TRICARE programs.
Complaint ¶¶ 211-343.

The complaint alleges that the Debtors' certifications
were false or fraudulent because they failed to disclose the
Debtors' violations of federal law, namely the Stark Law and
the Anti-Kickback Statute incurred in connection with the
Debtors' entry into a contract with North Broward Hospital
District ("Broward Health") to supply Broward Health with
radiation oncology services (the "Broward Contract").

8

Having on January 30, 2018 concluded to dismiss the
complaint's claims for violation of the False Claims Act
based on the Debtors' alleged violation of the Stark Law
premised on the Debtor's offer of improper patient
referrals, I now address the complaint's claims based on the
Debtor's alleged violation of the Anti-Kickback Statute.

When considering a motion to dismiss under Fed. R. Civ.
P. 12(b)(6), incorporated by Fed. R. Bankr. P. 7012, a court
must assess the legal feasibility of the complaint, not
weigh the evidence that might be offered in its support.
*Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999).

The Court's consideration is limited to facts stated on
the face of the complaint and the documents appended to the
complaint or incorporated in it by reference, as well as
matters of which judicial notice may be taken. *Hertz Corp.
v. City of New York*, 1 F.3d 121, 125 (2d Cir. 1993), *cert.
denied*, 510 U.S. 1111 (1993).

The availability of judicial notice is relevant here
because the basis for the remaining aspect of the motion to
dismiss is the alleged prior public disclosure of the crux
of the Debtors' alleged Anti-Kickback Statute violations,
and therefore the Plaintiff's failure to comply with section
3370(e)(4)(A)-(B) of the False Claims Act's gatekeeping
requirement, in a publication with the wonderful name of the

9

"Florida Bulldog," as well as public website disclosure of Broward Health's Board of Commissioners' meeting minutes pertaining to the Broward Contract and SEC filings also mentioned in the "Florida Bulldog". The Plaintiff does not contest that such disclosures occurred as quoted by the Debtors before he made the complaint available to the Government, or that he did not provide any original information to any of those sources, but he does contest whether the disclosures preclude the complaint.

When considering a motion to dismiss, one must accept the complaint's factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 323 (2007). If a complaint's allegations are clearly contradicted by documents incorporated into the pleadings by reference, however, the court need not accept them. *Labajo v. Best Buy Stores, LP*, 478 F. Supp. 2d, 523, 528 (S.D.N.Y. 2007). Moreover, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, the complaint must state more than "labels and conclusions and a formulaic recitation of the elements of the cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

10

Relatedly, while the Supreme Court has confirmed in light of the notice pleading standard of Federal Rule of Civil Procedure 8(a) that a complaint does not need detailed factual allegations to survive a motion under Rule 12(b)(6), see *Erickson v. Pardus*, 551 U.S. 89, 93-4 (2007), and *Bell Atlantic v. Twombly*, 550 U.S. at 555, "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. at 555. The complaint must contain sufficient facts accepted as true to state a claim that is "plausible on its face." *Id.* at 570. In other words, the plaintiff must allege sufficient facts to "nudge the claim across the line from conceivable to plausible". *Id.* Otherwise, the defendant should not be subjected to the burdens of discovery and the worry of overhanging litigation. *Id.*

Evaluating plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief" under Rule 8. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plausibility standard is not akin to a probability requirement, but it asks for more than sheer possibility

11

that a defendant has acted unlawfully.  *Id.*

As noted, the False Claims Act is an anti-fraud statute.  It therefore is clear that in addition to complying with Fed. R. Civ. P. 8 a complaint asserting a False Claims Act claim must comply with Fed. R. Civ. P. 9(b), incorporated by Fed. R. Bankr. P. 7009.  *See Gold v. Morrison-Knudsen Co.* 68 F.3d 1475, 1477 (2d Cir. 1999).

Rule 9(b) requires that a plaintiff alleging fraud state with particularity the circumstances constituting fraud.  Generally to satisfy that particularity requirement a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 1994).

Rule 9(b) also requires pleading with particularity when the alleged fraud involved the failure to disclose, or a fraudulent omission.  "In cases where the alleged fraud consists of an omission and the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege (1) what the omissions were, (2) the person responsible for the failure to disclose, (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the

12

fraud." *Kelly v. Jefferies Grp., Inc.*, 2018 U.S. Dist.
LEXIS 26090, at *17 (S.D.N.Y. Feb. 15, 2018), citing *Odyssey
Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85
F. Supp. 2d 282, 293 (S.D.N.Y. 2000), *aff'd* 2 F. App'x, 109
(2d Cir. 2001).[6]

That application of Rule 9(b) clearly also applies to
"false pretenses" as one of the prongs under 11 U.S.C. §
523(a)(2)(A) for a declaration of non-dischargeability, as
noted by many bankruptcy courts, including courts in the
Second Circuit. *See In re Ellis*, 400 F. Supp. 1112, 1114-15
(S.D.N.Y. 1975); *In re Ippolito*, 2013 Bankr. LEXIS 866, at
*17 (Bankr. E.D.N.Y. March 6, 2013); In re Howard, 2009
Bankr. LEXIS 3743, at *8-9 (Bankr. S.D.N.Y. Nov. 25, 2009);
and *H.J. Bushka Lumber & Millwork v. Boucher (In re
Boucher)*, 336 B.R. 27, 36 (Bankr. D. Conn. 2005). *See also
In re Wiszniewski*, 2010 Bankr. LEXIS 2894, at *12-13 (Bankr.
N.D. Ill. Aug. 31, 2010), citing *In re Lane*, 937 F.2d 694,
698-99 (1st Cir. 1991).

In the Second Circuit, Rule 9(b)'s particularity
requirement applies to two different sets of facts with
respect to False Claim Act claims. First, Rule 9(b) applies

---

[6] Where the circumstances of the alleged fraud are particularly within
the opposing party's knowledge, Rule 9(b) permits pleading on
information and belief, provided that the complaint must adduce
sufficient facts supporting a strong inference of fraud." *Wexner v.
First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

to the allegedly false enrollment and billing certifications that the defendant submitted to the Government.  There is some dispute about the degree of particularity that has to be alleged with respect to such certifications -- whether they can be described in the aggregate or instead whether each false certification needs to be described individually, although the weight of the case law suggests that the complaint must plead the false billing certifications with "a high degree of particularity," which may be done, however, by providing sufficient exemplars or identified pools or other information to put the defendant on reasonable notice. *See U.S. ex rel. Kester v. Novartis Pharmaceutical Corp.*, 23 F. Supp. 3d 242, 255-56, 258 (S.D.N.Y. 2014).  *See also U.S. ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 87-98 (2d Cir. 2017); *U.S. ex rel. Arnstein v. Teva Pharmaceuticals USA, Inc.*, 2016 U.S. Dist. LEXIS 22554, at *40-44 (S.D.N.Y. Feb. 22, 2016).

That is not the only fraud, however, that needs to be pled with particularity with respect to False Claims Act claims.  In addition, the complaint must plead with particularity the facts that gave rise to the fraudulent certification to the Government.  *U.S. ex rel. Chorches v. Am. Med. Response*, 865 F.3d at 83-85, (2d Cir. 2017).  *See also Arnstein v. Teva Pharmaceuticals*, 2016 U.S. Dist. LEXIS

14

22554, at *46-47 ("Where an FCA claim is based on violations
of the anti-kickback statute, plaintiff must plead with
particularity [under Rule 9(b)] the who, what, when, where
and how of the fraudulent scheme.") (internal quotation and
citation omitted); *Chen v. EMSL Analytical*, 966 F. Supp. 2d
at 301-303; *U.S. ex rel. NPT Assocs. v. Lab. Corp. of
America Holdings*, 2015 U.S. Dist. LEXIS 155601, at *12-14
(S.D.N.Y. Nov. 17, 2015) (plaintiff "must plead both the
alleged scheme and the specific false claims for payment
with particularity.").

The Debtors' motion to dismiss does not assert that the
complaint's allegations regarding the Debtors' enrollment
and billing certifications to the Government violate Rule
9(b), but, rather, focuses on the complaint's allegations
regarding why the certifications were fraudulent: for our
purposes, the Debtors' alleged violation of the Anti-
Kickback Statute.

Several times the complaint quite broadly states that
the Debtors' "bribes" to Broward Health and/or its CEO,
Frank Nask ("Nask") are the basis for its alleged Anti-
Kickback Statute claims. See, for example, complaint ¶¶ 8,
10, 11, 16, 47, 52, 68, 90, 226 and 317. Clearly, offering
a bribe in return for payments under a Federal health care
program violates the Anti-Kickback Statute. 42 U.S.C. §

15

1320a-7b(b)(2) states that "Whoever knowingly and willfully offers any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person – (A) to refer an individual to a person for the furnishing or arranging the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to . . . arrange for or recommend . . . ordering any facility, service or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony."

Courts have defined "remuneration" as used in the Anti-Kickback Statute broadly, such that it is not limited to monetary kickbacks or bribes, *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995), and the term has been held to include "anything of value." *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d. 747, 756 (S.D.N.Y. 2018). However, in common parlance one thinks of a "bribe" as at least a promise of financial reward that the offeror can plausibly deliver. What the complaint actually alleges besides the conclusory use of the terms "bribes" and "financial inducements" is something less than that and, moreover, it does so without sufficient particularity as to the scope of Rubin's agency and his actions on the Debtor's

16

behalf when he allegedly made such offers, assuming that Rule 9(b) applies to those allegations.

Although there is some confusion in the case law as to when Rule 9(b) applies to pleading the circumstances of an alleged agency, I conclude that Rule 9(b) applies here to the complaint's allegations pertaining to Rubin's agency and that the complaint fails to comply with the Rule. A host of cases hold that where the agency relationship is central to a fraud claim it needs to be pled with particularity under Rule 9(b). That is clearly the situation here: Rubin's agency is, as previously noted and discussed later in more detail, the only substantially new fact not included in the prior public disclosures. The leading case is probably *Kolbeck v. LIT America*, 923 F. Supp. 557, *aff'd* 152 F.3d 918 (2d Cir. 1998), but many other courts take that view, as well. *See*, for example, *Sun Life Assurance Co. v. Imperial Holdings, Inc.*, 2014 U.S. Dist. LEXIS 188601, at *10-12 (S.D. Fla. June 26, 2014); *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011); *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 899 (N.D. Ill. 2009); *Karamath v. United States Bank*, 2012 U.S. Dist. LEXIS 135038, at *15-16 (E.D.N.Y. Aug. 29, 2012), and certain of the authorities cited by the Debtors, including *In re Lois/USA, Inc.,* 264 B.R. 69, 139 n.177

17

(Bankr. S.D.N.Y. 2001); *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 563 (Bankr. S.D.N.Y 2009); *Mincey v. World Savings Bank, FSB*, 614 F. Supp. 2d 610, 627 (D.S.C. 2008); *Cohen v. Standard Bank Investment Corp.*, 1998 U.S. Dist. LEXIS 17569, at *10-16 (S.D.N.Y Nov. 6, 1998); and *Able v. Farmers Commodities Corp.*, 2000 U.S. Dist. LEXIS 22887, at *22-24 (N.D. Iowa Mar. 30, 2000).

Some courts have viewed the particularity requirement of Rule 9(b) more narrowly where the agency itself is not part of the fraud allegation. *See*, for example, *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 469 (S.D.N.Y. 2005), and *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 291 (S.D.N.Y. 2005), and vicarious liability was simply sought because of the employment relationship, which is assumed if the agent is, unlike Ruben an actual employee of the company.

Of course, Rule 8 also applies to the complaint's pleading of Rubin's agency, and it is clear that mere conclusory allegations of agency should not suffice to establish an agency relationship, especially where the (wrongful) scope of the agency is not apparent simply from an employee's job title. *See*, for example, *Green v. Beer*, 2009 U.S. Dist. LEXIS 27503 (S.D.N.Y. Mar. 30, 2009), where the court declined to determine whether Rule 9(b) applied

18

because the agency relationship was pled with mere
conclusory allegations that would not even satisfy Rule 8.

In footnote 22 of that opinion, the court states,
"[defendant] suggests that plaintiffs must plead their
agency theory with Rule 9 particularity.  Because the Court
finds that plaintiffs did not meet even the more liberal
Rule 8 pleading standard, the Court need not reach this
issue.  Courts have required that agency be pled with Rule 9
particularity where an apparent agency relationship was an
integral element of the alleged fraud [citing *Kolbeck* 923 F.
Supp. at 569.]" *Id.* at *42 n.22.  Judge Wood then continues,
"Applying Rule 9 made sense in *Kolbeck* because, in that
case, the plaintiffs were party to the events that created
the appearance of the agent's authority to act on behalf of
the alleged principal and thus could plead the facts with
Rule 9 particularity. But *Kolbeck's* logic may not apply in
this case where actual agency is alleged. . . . Demanding
Rule 9 particularity would seem to make less sense in a case
such as this one where plaintiffs contend that defendants
and their associates hid their agency relationship.  Where
an agency relationship is hidden, plaintiffs cannot be
expected at the pleading stage to know the particulars of
how, when and where the agency relationship was created.
Thus, they should not be required to plead that relationship

19

with Rule 9 particularity." *Id.*

The key provisions of the complaint at issue are Paragraphs 51 through 59, which deal with the Debtors' alleged violation of the Anti-Kickback Statute.  Before turning to them, however, it is worth noting paragraphs 41 through 46 of the complaint, which are referred to in paragraphs 51 and 52.  Those earlier paragraphs state that the Debtors had been seeking a contract for Broward Health's radiation therapy service line since "as early as 2006." Complaint ¶ 41.  As part of that effort, the complaint alleges that the Debtors through their CEO, Daniel Dosoretz ("Dosoretz") offered patient referrals to Broward Health, but Broward Health's CEO at the time rejected the proposed contract.  *Id.* ¶¶ 42-43.  The complaint also alleges that at some time between 2007 and 2009 Dosoretz offered the Treasurer of Broward Health's Board of Commissioners "the opportunity to manage surgery centers in Jacksonville Florida," and the Treasurer also received but did not accept a call from a Florida congressman ostensibly on the Debtors' behalf, but the Treasurer also opposed the proposed contract, which was not then agreed.  *Id.* ¶¶ 44-46.

Paragraph 51 of the complaint then states, "In 2011, Dosoretz and [the Debtors] hired lobbyist Bill Rubin to approach Broward Health's then Chief Executive Officer,

20

Frank Nask, with a similar proposal as was previously
rejected by [Broward Health's former CEO and Treasurer]."
Notably, this is one of the complaint's two paragraphs
describing the scope of Rubin's agency as the Debtors'
lobbyist for the Broward Contract -- and the only one that
does so in more than conclusory terms -- and that scope does
not involve offering any bribes or other remuneration to
Nask or anyone else. Rubin is instead stated to have been
hired to make a similar contract proposal to provide
radiation oncology services.

Paragraph 51 continues by stating that "Dosoretz and
[the Debtors] deliberately chose and retained Rubin as their
agent and lobbyist because he was and is a close friend of
[Florida's] Governor Scott." But this is an innocuous
allegation: lobbyists are generally retained because of
their political connections. Moreover, as discussed later,
before the filing of the complaint two "Florida Bulldog"
articles separately linked the award of the Broward Contract
to the Debtors' political influence with Florida's governor.

Paragraph 52 is the only other paragraph in the
complaint purporting to describe the extent of Rubin's
agency, but it does so in general and conclusory terms,
stating, "Dosoretz directed Rubin to offer financial
inducements and bribes to the new CEO, Frank Nask in

21

exchange for his support of the [Broward Contract].  At all times relevant, Bill Rubin acted at the direction of [the Debtors] as its [sic] agent."  Thus the complaint merely repeats the gravamen of the Anti-Kickback Statute – the offer of financial inducements or bribes -- as applied to the scope of Rubin's agency.  Nor does it place Dosoretz's charge to Rubin in any specific time frame or state the basis for the complaint's assertion that Dosoretz directed Rubin to offer Nask specific bribes or kickbacks.

Indeed, at oral argument counsel for the Plaintiff acknowledged with respect to this paragraph that "[t]here is no direct evidence of that," and that, "[t]he evidence of the scheme is the attempt by Dr. Dosoretz to bribe the former CEO."  Transcript of January 30, 2018 hearing on Debtors' motion to dismiss, at 118-19.  As noted, however, those paragraphs of the complaint describing Dosoretz's interaction with the former CEO over four years before the events underlying the complaint's Anti-Kickback Statute claims do not allege the offer of bribes or kickbacks, let alone describe any such offers with particularity.

Paragraph 53 of the complaint then states, "Nask's job was in jeopardy because he had been appointed under the prior administration of Florida Governor Charlie Crist. Nask had supported a plan to privatize the [Broward Health]

22

District, which would have undermined Governor Scott's
control of the District exercised through the appointment of
its commissioners.  Under Nask's watch, the Federal
Government was also investigating Broward Health's
compensation arrangements with 27 employed physicians for
suspected violations of the Stark Laws."  (It is clear from
the rest of the complaint that this investigation did not
have anything to do with the Debtors.)

Paragraph 54 states, "Nask was several years away from
retirement and had power, compensation and benefits as CEO.
His career options were limited due to his age and the
ongoing federal investigation."

Paragraphs 55 through 57 then allege, "Acting as agent
for [the Debtors], Rubin contacted Nask in 2011.  Rubin told
Nask that he controlled the Governor's appointments to the
Broward Health Board of Commissioners and thereby controlled
Nask's continued employment, which depended upon whether
newly appointed commissioners would support Nask as CEO.  As
[the Debtors'] lobbyist and agent, Rubin asked Nask to
support [the Debtors'] plan to obtain full control over all
radiation oncology services provided at Broward Health.  In
exchange, Rubin promised Nask that he would protect Nask's
continuing employment, salary, pension benefits and
severance when he retired as CEO.  Rubin told Nask that if

23

[the Debtors] did not obtain the contract, then Rubin would make sure that new Commissioners would be appointed who would terminate Nask's employment."  Again, whether Rubin was empowered by the Debtors to make such threats and promises is stated in the most conclusory terms, and, in addition, the complaint fails to state when and where Rubin's alleged promises and threats were made or the basis for believing that they were made.

Paragraph 59 concludes, "In this manner executives at [the Debtors] hired and paid Rubin to offer political protection and financial security for Nask in exchange for an exclusive prized contract. . . .  [The Debtors] and Dosoretz intended for Rubin to offer illegal inducements to Nask in order to obtain their contact."  Once more, the complaint fails to state the scope of Rubin's agency except in the most conclusory terms, reciting the gravamen of the Anti-Kickback Statute, and does not state the particulars of how and when the Debtors gave Rubin this assignment or how and when Rubin made his threats and promises or the basis for believe that such things happened.

Moreover, because the offer of "financial security" is tied by the complaint only to Rubin's "political protection" from Governor Scott one has to ask whether the complaint alleges in even a plausible way for purposes of Fed. R. Civ.

24

P. 8 that Rubin's influence was sufficient to override the
Governor's legitimate exercise of discretion over the
appointment of Broward Health's Board of Commissioners –
that is, whether Ruben's influence exceeded his statement
that he got to know the Governor "in 1991 when he started
his hospital company, and we've stayed close ever since.  I
love him. . . .  He's a very good friend.  We've stayed in
touch ever since." *Id.* ¶ 51 n. 1.

The complaint does state that on August 29, 2011,
before he was appointed to Broward Health's Board of
Commissioners, the Plaintiff "met Rubin at Timpanos
restaurant in Fort Lauderdale.  Rubin told [the Plaintiff]
that he was 'controlling the appointments' for the Broward
Health Board." *Id.* ¶ 81.[7]  However, the complaint never
states the apparent basis for this boast with the exception
that, apparently at the same meeting, "Rubin told
[Plaintiff] that the owner of the Debtors, Daniel Dosoretz,
was a 'close friend' of Governor Scott and a major
contributor to his campaign and that securing the [Broward
Contract] was a 'top priority.'" *Id.* ¶ 84.  The complaint
goes on to state that the Plaintiff was in fact appointed to

---

[7] The complaint also alleges that the Plaintiff's former employer
"encouraged him to apply for a Commissioner position at Broward Health
and advised him that he would speak with Rubin because Rubin was
'controlling all appointments' to the Broward Health Board." Id. ¶ 80.

Broward Health's Board several days later, *id.* ¶ 87,[8] leading
to the inference that Rubin may have had some sway over the
appointment, but that the Plaintiff was not involved in
Broward Health's entry into the Broward Contract, which
occurred before he attended his first Board meeting. *Id.* ¶
88.

The complaint goes on to allege that Nask obtained
Board approval of the Broward Contract by making false
representations regarding the Contract's merits and the
defects of the existing contact with an entity known as
HealX that it would replace. *Id.* ¶¶ 91 through 106.  The
complaint does not cite any sources for these allegations of
what transpired at the Board meeting, which the Plaintiff
did not attend; apparently they are taken from the published
Board minutes.  Opposition to the contract by one of the
Commissioners in the minutes publicly highlighted its
primary defects, moreover, pointing out that "the contract
was awarded without bids and could be extended for up to 25
years" and "no economic analysis had been provided to
support [it]." *Id.* ¶ 92.

Paragraph 107 of the complaint sums up the foregoing

---

[8] In addition, the complaint alleges that apparently after the Broward
Health contract was approved but "[w]hile he was still retained by and
serving at [the Debtor's] lobbyist, Rubin lobbied the Broward Health
Board to give Nask a generous severance package," which was granted. *Id.*
¶ 72.

26

allegations, again in a conclusory fashion, as follows:
"Nask did all of the foregoing because (1) Rubin, the
Debtor's agent, got Nask what he wanted -- the continuation
of his lucrative salary, benefits, and a rich retirement
package, and (2) [although I've already found that this was
not actually sufficiently pled in the complaint to establish
a violation of the Stark Law], Dosoretz promised increased
patient referrals to Broward Health from [the Debtors']
major network of employment of employed physicians."

The complaint also discusses a meeting between the
Plaintiff and Dosoretz in 2013, after the Plaintiff had
developed and expressed concerns to Rubin and others,
including Governor Scott about the Broward Contract, the
related termination of HealX, and Rubin's influence. *Id.* ¶
185-88.  However, this description only references
Dosoretz's statement that he had a 'close relationship' with
Governor Scott, that Broward Health was a 'strong partner,'
*id.* ¶ 187, and that Dosoretz "was arranging for meetings
with Nask and Governor Scott so that 'the Governor would
know that Frank [Nask] is a good guy.'"  *Id.* ¶ 188.  It
contains nothing about the scope of Rubin's agency on the
Debtors' behalf when the Broward Contract was being
considered nor more than Dosoretz's boast that he, Dosoretz
has political influence based on his relationship with

27

Governor Scott.

Thus there are three problems with the complaint's allegations pertaining to the Anti-Kickback Statute.  First, the scope of Rubin's agency on behalf of the Debtors, which -- given the Plaintiff's contemporaneous belief that Rubin was the Debtors' lobbyist, the Plaintiff had the opportunity to explore but did not -- is not described with sufficient particularity for purposes of Rule 9(b). (And, when the complaint describes the scope of Rubin's agency with any particularity, it merely discusses the Debtors' unsuccessful 2007 attempt to obtain a long-term contract with Broward Health and Rubin's boasting that he has Governor Scott's ear).  There is a clear explanation for this failing: counsel for the Plaintiff has acknowledged that she has no basis to know if the Debtors charged Rubin with the assignment of offering valuable consideration to Nask beyond what Governor Scott could already deliver or withhold in return for his support.

Moreover, to the extent described in anything other than conclusory terms, the complaint's assertions that Ruben was able to control Governor Scott, Svengali-like, as opposed to exerting ordinary political influence on him on behalf of a well-heeled client, are not plausible, at least without additional detail confirming more than ordinary

28

political loyalties and the governor's exercise of power
under Florida law.

And, last, it is only by properly pleading Rubin's role
that the complaint might overcome the gatekeeping
requirement of section 3730(e)(4)(A) and (B) of the False
Claims Act, because, as discussed in greater detail later,
the Debtors' influence, though not specifically control,
over Governor Scott was already publicly disclosed in the
"Florida Bulldog" articles that the Debtors' motion to
dismiss quotes and which I can take judicial notice of. In
fact, the Debtors' political influence, if not control, over
Florida's governor was the main focus of those articles,
which also disclose unusual, non-market features of the
Broward Contract (which also, they state, were previously
publicly disclosed in the Broward Health Board minutes and
are available in the Debtors' SEC filings).

As far as the complaint is concerned, therefore, Rubin
is just the mouthpiece for the Debtors' previously publicly
disclosed political influence, nothing more.  Because the
complaint does not assert anything material beyond what was
already publicly disclosed, it thus runs afoul of section
3730(e)(4)(A) and (B) of the False Claims Act.  That is, the
complaint's remaining Anti-Kickback Statute allegations are,
at their core, substantially the same as previously

29

published in the news media and the Board's minutes, and the
complaint does not evince a knowledge that is independent of
and materially added to those publicly-disclosed allegations
or transactions.

Again, the complaint fails the initial, critical test
of establishing the scope of Rubin's agency and what Ruben
did in that role.  Florida law, which applies here to the
complaint's description of Rubin's agency relationship since
all the relevant activity occurred in Florida, recognizes
three ways that a principal can be held liable for the acts
of its agent within the scope and course of the agency - a
proposition that, if in fact the agency is properly
established, is clear.  *Roessler v. Novak*, 858 So. 2d 1158,
1161 (Fla. 2d DCA 2003).

First, Florida recognizes "apparent authority" to
establish an agency relationship, but such authority is not
pled in the complaint.  Apparent authority "rests on
appearances created by the principal and not by the agent
that the agent is, in fact, acting as an agent for the
principal."  *Harrington v. RoundPoint Mortg. Servicing
Corp.*, 2017 U.S. Dist. LEXIS 55022, at *26 (M.D. Fla. Apr.
10, 2017).  That one factor is all that need be considered
here without analyzing any other requirements for "apparent
authority," such as reasonable reliance, *Almerico v. RLI*

30

*Ins. Co.*, 716 So.2d 774, 777 (Fla. 1998), because no paragraph in the complaint alleges that Dosoretz or anyone else on the Debtors' behalf acknowledged to the Plaintiff, or to anyone else for that matter, that Rubin was acting as the Debtors' agent regarding entry into the Broward Contract, or created the appearance of such an agency, or the scope of any such agency.

Under Florida law one can also be deemed an agent based on "actual agency." To establish an actual agency relationship under Florida Law, the Plaintiff must plead (1) acknowledgment by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) the principal's right to control the agent's actions. *PYCSA Panama, S.A. v. Tensar Earth Technologies, Inc.*, 625 F. Supp. 2d 1198, 1252 (S.D. Fla. 2008), citing *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 (Fla. 2003). *See also Florida State Oriental Medical Association, Inc. v. Slepin*, 971 So. 2d 141, 145 (Fla. Dist. Ct. App. 2007) (plaintiff must show "evidence that the principal acknowledged the agent's power, that the agent accepted the responsibility of representing the principal, and the principal retained control over the agent's actions"). The principal's right to control rather than its actual control is sufficient, and, obviously, that showing is made by

31

setting forth the context and scope of the agency
relationship. *Villazon v. Prudential Healthcare Plan*, 843
So. 2d at 853.  Again, though, the complaint does not
satisfy these requirements except in a conclusory or
ineffective fashion.  It fails to allege the context and
scope of Rubin's agency -- and therefore also fails to
allege the Debtors' acknowledgment of Rubin's power to act
on their behalf or that the Debtors retained the right to
control Rubin -- with any particularity, let alone that the
Debtors' authorized Rubin to exert improper pressure on
Nask.  The complaint also does not provide the details
required by Rule 9(b) as to Rubin's performance of his
agency with Nask.

Finally, "implied authority" can be established
under Florida law for an agent to act in a way incidental to
or as is reasonably necessary to accomplish an actual agency
relationship.  *Board of Trustees of the City of Delray Beach
Police and Firefighters Retirement System v. Citigroup
Global Markets, Inc.*, 622 F.3d 1335, 1342-43 (11th Cir.
2010).  Having failed to plead Rubin's actual or apparent
agency with any particularity, however, the complaint does
not plead "implied authority," either, let alone implied
authority to offer improper inducements to Nask.

Here, Rubin's agency is at the center of the Anti-

32

Kickback Statute claim: in the complaint, the Debtors act through him. If the complaint is to add materially to the prior public disclosures, it therefore would be in the complaint's description of Rubin's agency and actions.  Thus under *Kolbeck*, 923 F. Supp. at 557, and *In re Lois/USA, Inc.*, 264 B.R. at 139 n. 177, and the other authorities discussed above, his central role must be pled with particularity, including the nature of his agency as well as how he performed it.

Moreover, unlike in *Green v. Beer*, 2009 U.S. Dist. LEXIS 27503, at *42 n.22, the complaint alleges that the Plaintiff understood Rubin to be the Debtors' lobbyist based on Rubin's (although not the Debtors') statements.  Indeed, the complaint alleges that some time after the Broward Contract was entered, the Plaintiff met again with Rubin, who reiterated that he was the Debtors' lobbyist, as well as met with Dosoretz.  Nevertheless, the complaint fails to plead the scope of Rubin's agency with any particularity and Plaintiff's counsel has acknowledged it to be unknown although it was within Plaintiff's power to explore whether, for example, the Debtors directed Rubin to threaten Nask with the loss of his job, or directed Rubin to control Florida's governor to direct Broward Health's Board of Commissioners to improve Nask's retirement and severance

33

package.[9]

Thus I conclude that these deficiencies in the complaint raise two independent grounds for the complaint's dismissal. First, because the complaint hinges upon allegations that Rubin acted on behalf of the Debtors in making threats to Nask that he could actually deliver on, such as that Nask would lose his job and retirement benefits, or that he would keep his job and keep the retirement benefits, depending on whether he supported the Broward Contract, the complaint fails because it does not describe the scope and nature of Rubin's lobbying role with sufficient particularity.

Indeed, I believe that Rubin's role and actions are not even pled sufficiently for purposes of Rule 8, given the conclusory nature of its allegations and the implausibility, without more, that Rubin, even if directed to do so by the Debtors, had the power actually to control Governor Scott regarding Broward Health.

Last, the motion to dismiss correctly states that under 31 U.S.C. § 3730(e)(4) the relator must assert claims that

---

[9] As noted by the Second Circuit, moreover, even under the more relaxed "information and belief" pleading standard under Rule 9(b) where the facts are uniquely within the knowledge of the defendant, the plaintiff's claims must be based on sufficient factual allegations to raise a strong inference that the fraudulent scheme occurred. *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *United States ex rel. NPT Assocs.*, 2015 U.S. Dist. LEXIS 155601, at *13-14. Here, that simply is not the case.

34

are not substantially similar to the allegations or
underlying facts previously publicly disclosed in the "news
media" unless the person bringing the action is an original
source of that information or provided it in a timely
fashion to the Government. *United States ex rel. Kirk v.
Schindler Electric Corp.*, 437 Fed. App'x 13, 17 (2d Cir.
2011); *United States ex rel. Patriarca v. Siemens Healthcare
Diagnostics, Inc.*, 295 F. Supp. 3d 186, 196-97 (E.D.N.Y.
2018).

It is undisputed that the Plaintiff was not an original
source of the "Florida Bulldog" articles from February 22
and 24, 2016, which predate his complaint.[10]  Moreover, it is
undisputed that the minutes of the January 30, 2012 Board
meeting at which the Broward Contract was approved not only
were mentioned by the "Florida Bulldog" but also were posted
publicly on the Board's website before the complaint not
because of the Plaintiff's actions but simply because all
the Board minutes were handled that way.

The first, February 22, 2016 "Florida Bulldog" article,
states, "An oncology company financially connected to Gov.
Rick Scott got a no-bid contract four years ago from
taxpayer-supported Broward Health for as long as 25 years -
an unprecedented term.  Scott was an investor in a private

---

[10] The articles are attached as Exhibits B and C to the Declaration of
Michael P. Esser in support of the Debtors' motion to dismiss.

35

equity firm that owns 21st Century Oncology, state records show. . . . 'This is news to me.' Said Commission Chairman David Di Pietro, who seemed stunned last week when told of the governor's indirect ownership interest in 21st Century Oncology. . . . The North Broward Hospital District, Broward Health's legal name, is and was at the time run by an all-Republican board of commissioners appointed by the governor. . . . Information about the contract is contained in publicly traded 21st Century's filings with the U.S. Securities and Exchange Commission (SEC) and the minutes of a Jan. 30, 2012 board meeting when the deal was approved by a 5-1 vote."

The February 24, 2016 "Florida Bulldog" article states, "A cancer-treatment company financially tied to Gov. Rick Scott that got a no-bid 25-year contract from Broward Health in January 2012 later contributed nearly $400,000 to the Governor's reelection campaign, state records show." And it further states, "The contract spells out the terms of an exclusive and lengthy arrangement in which Broward Health gave 21st Century Oncology LLC exclusive rights to supply radiation oncology services to Broward Health's patients – and collect all the revenue those patients generate. 21st Century paid Broward Health nothing to obtain that access. Likewise, Broward Health did not pay 21st Century to assume

36

a practice area that then-Broward Health President and Chief Executive Frank Nask told the district's board of commissioners in 2012 was losing $3.5 million a year.  Why would 21st Century want to take over a money-losing operation?  How might it turn into a profit maker?  Kevin Fusco, who holds Nask's job today was asked by email to discuss the oncology radiation program's performance under 21st Century.  He did not respond."

And then the February 24, 2016 article reiterates, "Throughout all this time, 21st Century was a reliable contributor to Governor Scott, who appoints Broward Health's governing Board of Commissioners."

Before the Plaintiff shared his complaint with the United States the terms of the Broward Contract itself also were a matter of public knowledge based on Broward Health's SEC filings, as were reservations about the Contract expressed at the key Board meeting regarding its approval.

The case law on 31 U.S.C. § 3730(e)(4)(A) and (B) is well summarized in *Chen v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282 (S.D.N.Y. 2013).  There the court states that the two-part test laid out in that section first requires determination of whether substantially the same allegations or transactions as alleged in the action or claim were previously publicly disclosed through one or more of the

37

sources, including "news media" listed in the statute. *Id.* at 296.

It is clear that the courts interpret "news media" in this context broadly, rejecting a "cramped reading of the term to include smaller or professionally specialized reader bases." *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011); *see also United States ex rel. Alcohol Foundation v. Kalmanovitz Charitable Foundation Inc.*, 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002), as well as *Chen*, 966 F. Supp. 2d at 297.

And as far as whether the disclosures in the news media contain "substantially the same allegations or transactions as alleged in the action," *Chen* states -- and I believe this to be the law throughout the Second Circuit as well as, frankly, throughout the country, or at least the proper version of the law throughout the country – "[t]his is the case when the relevant disclosures exposed 'all the essential elements of the fraud' alleged and made public the 'crux' of the alleged fraud." *Id.* at 297, citing *United States v. Dialysis Clinic, Inc.*, 2011 U.S. Dist. LEXIS 4862, at *20 (N.D.N.Y. Jan. 19, 2011), which held that section 3730(e)(4) " is applicable only if the essential elements exposing the transaction as fraudulent are publicly disclosed."

38

*Chen* also favorably relies on the following quote from *In re Natural Gas Royalties Qui Tam Litig.*, 562 F.3d 1032, 1041 (10th Cir. 2009):  the public disclosures need to be "sufficient to set the government squarely upon the trail of the alleged fraud."  That is, the prior public disclosures need to have sufficed "to enable [the Government] adequately to investigate the case and to make a decision whether to prosecute. The question, properly, then, is whether the information conveyed to the [G]overnment could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing."  *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1993), quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1377 (D.C. Cir. 1981). *See also U.S. ex rel. Patriarca v. Siemens Healthcare Diagnostics*, 295 F. Supp. 3d at 196-197, stating both that the pre-2010 case law would apply to this provision and that "merely providing more specific details about what happened does not negate substantial similarity."

Consistent with the foregoing authorities, to go beyond the allegations in the "Florida Bulldog" articles and public postings the Plaintiff therefore would need to disclose more than mere details that would make those allegations only

39

more concrete or more provocative.

Such a mere detail, I believe, is the complaint's
discussion of the termination of the HealX contract, which
was not mentioned directly in the "Florida Bulldog" articles
that I have quoted although the second article does discuss
the Debtors' taking over a prior Broward Health business,
which was, in fact, conducted through HealX.  Given all of
the other disclosures in the articles and the Board minutes
– such as that the Debtors obtained a no-bid contract of
extraordinary length, Nask's statement that the prior
contractor lost $3.5 million annually, and questions
therefore raised about the reason for the Debtors' eagerness
to obtain the contract – the complaint's HealX discussion
falls into the "extra detail" category described as
insufficient in *Chen* and *Patriarca* and the other cases cited
earlier.

That leaves, then, the complaint's discussion of
Rubin's lobbying effort, which was not mentioned in the
"Florida Bulldog" articles or otherwise publicly disclosed.
But, as I have already held, the complaint does not discuss
the nature and scope of Rubin's alleged agency with
sufficient particularity to satisfy Rule 9(b), and, indeed,
when discussing Rubin's role the complaint has serious
plausibility problems under Rule 8.

40

Lobbyists generally are hired because of their political connections.  It would be odd to hire a lobbyist who doesn't have a good relationship with the politician that he or she is supposed to lobby.  The good relationship between the alleged principal, 21st Century, and Governor Scott is already highlighted in the "Florida Bulldog" articles.  The complaint's additional allegations with regard to Rubin's lobbying relationship I believe therefore would need be more specific – and more specific in particular as to wrongdoing – than simply standing for the fact that Rubin had political influence.  To add materially to the prior public disclosure, the complaint would have to allege, I believe, that Rubin actually controlled Governor Scott, as if Governor Scott were his puppet, for example, and that the Debtors hired him for that purpose, as opposed to Rubin's simply being able to remind Governor Scott that the Debtors were a campaign contributor and a significant supporter, which the "Florida Bulldog" articles already disclose.

The complaint clearly does not make that kind of allegation other than, I believe, in an implausible and conclusory way when it asserts that the Plaintiff was told he needed to speak to Rubin to enhance his chances to be appointed to the Broward Health Board and that Rubin

41

separately boasted that he "controlled" the appointments
(which frankly I view as puffery).

Even assuming that all of Rubin's agency relationship
on behalf of the Debtors was outside of the Plaintiff's ken,
which I don't think is a fair assumption based on the
complaint's own allegations, the Plaintiff has the burden to
at least allege a substantial basis in fact to draw the
inference that Rubin (a) was tasked by the Debtors with
obtaining the Broward Contract by improperly offering
remuneration to Nask and (b) plausibly had the power over
Governor Scott to deliver on his threats and promises, and I
do not believe that the complaint does so.

I have not yet addressed whether the Plaintiff
satisfies the second, additional test of 31 U.S.C. §
3730(e)(4)(B)(2), which is that he be an "original source"
of information that materially and timely contributed or
added to the public disclosure.  However, based on the
foregoing analysis, it is clear that the complaint does not
meet that test, either.

The people of Florida elected Governor Scott,
giving him the power to select Broward Health's Board of
Commissioners, subject to the people's displeasure depending
on how he uses it.  The complaint adds nothing material to
the prior public disclosure that the Debtors had political

42

influence with the Governor, which he, in turn, might exert over the Board.

Accordingly, the remaining aspect of the motion to dismiss is granted.  Counsel for the Debtors should submit an order granting the motion in full for the reasons stated in my bench rulings.  The order should provide that the Plaintiff has 30 days from the date of such order to file a motion for leave to amend the complaint under Bankruptcy Rule 7015, which motion should attach the proposed second amended complaint, blacklined against the complaint that I have dismissed.

Dated:  White Plains, New York
        July 9, 2018

                              /s/Robert D. Drain
                              United States Bankruptcy Judge